# Exhibit 1

1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   DARREN J. ROBBINS (168593)
    JAMES I. JACONETTE (179565)
3   JENNIFER N. CARINGAL (286197)
    655 West Broadway, Suite 1900
4   San Diego, CA  92101
    Telephone:  619/231-1058
5   619/231-7423 (fax)
        – and –
6   DENNIS J. HERMAN (220163)
    DAVID W. HALL (274921)
7   Post Montgomery Center
    One Montgomery Street, Suite 1800
8   San Francisco, CA  94104
    Telephone:  415/288-4545
9   415/288-4534 (fax)

**FILED**
SAN MATEO COUNTY

MAR 3 0 2016

Clerk of the Superior Court
By _____
           DEPUTY CLERK

10  Attorneys for Plaintiffs

**File By Fax**

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                           COUNTY OF SAN MATEO

| | |
|---|---|
| 13  OMEGA CAPITAL INVESTORS, L.P., OMEGA CAPITAL PARTNERS, L.P., 14  OMEGA EQUITY INVESTORS, L.P. and OMEGA OVERSEAS PARTNERS, LTD., |  ) **VIA FAX** CIV537977 )  )  Case No. |
| 15            Plaintiffs, 16     vs. | )  COMPLAINT FOR VIOLATIONS OF THE )  SECURITIES ACT OF 1933 AND STATE )  LAW |
| 17  SUNEDISON, INC., TERRAFORM GLOBAL, INC., 18  AHMAD CHATILA, BRIAN WUEBBELS, 19  CARLOS DOMENECH ZORNOZA, MARTIN TRUONG, 20  JEREMY AVENIER, ALEJANDRO HERNANDEZ, 21  EMMANUEL HERNANDEZ, ANTONIO R. ALVAREZ, 22  PETER BLACKMORE, | )  )  )  )  )  )  )  )  )  )  )  )  **DEMAND FOR JURY TRIAL** |

23  [Caption continued on following page.]

24

25

26

27      Copyright © 2016 by Robbins Geller Rudman & Dowd LLP.  Robbins Geller Rudman & Dowd LLP will
    vigorously defend all of their rights to this writing/publication.  All rights reserved – including the right to reproduce in
    whole or in part in any form.  Any reproduction in any form by anyone of the material contained herein without the
28  permission of Robbins Geller Rudman & Dowd LLP is prohibited.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  CLAYTON DALEY JR.,                          )
   GEORGANNE PROCTOR,                          )
2  STEVEN TESORIERE,                           )
   JAMES B. WILLIAMS,                          )
3  RANDY H. ZWIRN,                             )
   GOLDMAN, SACHS & CO.,                       )
4  J.P. MORGAN SECURITIES LLC,                 )
   BARCLAYS CAPITAL INC.,                      )
5  CITIGROUP GLOBAL MARKETS INC.,              )
   MORGAN STANLEY & CO. LLC,                   )
6  MERRILL LYNCH, PIERCE, FENNER &             )
7     SMITH INCORPORATED,                      )
   DEUTSCHE BANK SECURITIES INC.,              )
8  BTG PACTUAL US CAPITAL LLC,                 )
   MACQUARIE CAPITAL (USA), INC.,              )
9  MCS CAPITAL MARKETS LLC and                 )
   DOES 1-25, inclusive,                       )
10                                             )
                                               )
11                                             )
                        Defendants.            )
12 ————————————————————————————— )

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................... 1

SUMMARY OF THE ACTION ..................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 2

PARTIES ........................................................................................................................ 2

    A.     Plaintiffs ........................................................................................................... 2

    B.     Company Defendants ....................................................................................... 3

    C.     Individual Defendants ..................................................................................... 4

    D.     Director Defendants ........................................................................................ 4

    E.     Underwriter Defendants ................................................................................... 5

    F.     Doe Defendants ............................................................................................... 8

BACKGROUND TO THE OFFERINGS ....................................................................... 8

    A.     SUNE Takes on Billions of Dollars in Debt as It Transforms Itself into a
           Renewable Energy Project Developer .......................................................... 8

    B.     SUNE Leverages Its TERP Interests to Obtain a $410 Million Margin Loan ........... 12

    C.     SUNE Prepares to Launch GLBL by Selling $510 Million in Preferred Class
           D Securities and Taking on More than $1 Billion in Debt ....................................... 13

    D.     SUNE Incurs Billions of Dollars in Debt and Obligations to Acquire Projects
           to Drop Down to GLBL and TERP and Misrepresents that It Has Ample
           Liquidity to Do So ...................................................................................... 15

    E.     As Its Liquidity Deteriorates, SUNE Proceeds with the GLBL IPO ......................... 18

    F.     Unbeknownst to Investors SUNE Borrows $169 Million from Goldman at an
           Astounding 15% Interest Rate to Finance the Acquisition of GLBL's Start-up
           Projects .......................................................................................................... 21

    G.     Five Days After the GLBL IPO Is Completed, SUNE Reports a Widening
           Second Quarter Loss that Increases the Risk of a Margin Loan Default, but
           Represents to Investors that Its Liquidity Remains Strong ....................................... 22

    H.     SUNE Does Not Disclose a Breach of the Debt Covenants on the Margin
           Loan .............................................................................................................. 25

    I.     SUNE Sells $650 Million in Preferred Stock Without Disclosing the 15%
           Goldman Loan, the Breach of the Margin Loan and Worsening Liquidity
           Risks to Investors ......................................................................................... 26

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1
2                                                                                    **Page**
3
    J.      SUNE's Liquidity Problem...................................................................................27
4
    K.     SUNE Cancels Projects, Reveals the Margin Loan Breach and the 15%
5              Goldman Loan, and Admits that It Had Insufficient Liquidity to Meet the
             Growth It Forecast ................................................................................................29
6
FIRST CAUSE OF ACTION ...............................................................................................35
7
    For Violation of §11 of the 1933 Act in Connection with the SUNE Preferred
8            Offering Against SUNE, Chatila, Wuebbels, Truong, the SUNE Directors
           and the SUNE Underwriters ...............................................................................35
9
SECOND CAUSE OF ACTION ...........................................................................................43
10
    For Violation of §12(a)(2) of the 1933 Act in Connection  with the SUNE Preferred
11           Offering Against SUNE, Chatila, Wuebbels, Alex Hernandez, the SUNE
          Directors and the SUNE Underwriters ...............................................................43
12
THIRD CAUSE OF ACTION ...............................................................................................45
13
    For Violation of §15 of the 1933 Act in Connection with the SUNE  Preferred
14           Offering Against Chatila, Wuebbels and Truong .............................................45
15
FOURTH CAUSE OF ACTION ...........................................................................................45
16
    For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection
17           with the Conversion of GLBL Class D Securities to GLBL Common Stock
          Against GLBL, SUNE, Chatila and Wuebbels ...............................................45
18
FIFTH CAUSE OF ACTION .................................................................................................55
19
    For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection
20           with the Purchase of GLBL Class D Securities Against GLBL, SUNE,
          Chatila, Wuebbels and the GLBL Placement Agents.......................................55
21
SIXTH CAUSE OF ACTION .................................................................................................59
22
    For Breach of Contract in Connection with the  Purchase of GLBL Class D
23           Securities Against GLBL..................................................................................59
24
SEVENTH CAUSE OF ACTION .........................................................................................61
25
    For Negligent Misrepresentation in Connection with the  Purchase of GLBL Class D
          Securities Against SUNE, GLBL, Chatila, Wuebbels and the GLBL
26           Placement Agents..............................................................................................61
27
PRAYER FOR RELIEF .........................................................................................................62
28
JURY DEMAND.....................................................................................................................62

- ii -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

**INTRODUCTION**

1.     SunEdison, Inc. ("SUNE") and its controlled subsidiary, TerraForm Global, Inc. ("GLBL"), their officers and directors and the investment banks working with them sold more than $2.5 billion of newly issued securities to Plaintiffs (as defined below) and other investors between June 2015 and August 2015.   Those securities were sold using offering documents that contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.  As the truth about SUNE and GLBL and the implications thereof began to emerge, the price of the securities purchased by Plaintiffs declined significantly, inflicting substantial harm on Plaintiffs.

**SUMMARY OF THE ACTION**

2.     SUNE is a worldwide developer of solar, wind and other renewable energy projects and facilities.  GLBL and its sister subsidiary, TerraForm Power, Inc. ("TERP"), were formed by SUNE and its Board of Directors to own and operate the renewable energy projects SUNE developed or acquired, returning the majority of the cash flow from those projects to investors as dividends.  TERP and GLBL – known as "yieldcos" for the dividends they were designed to generate – were marketed to investors as "high growth" companies that would generate annual dividend growth of 20% or more based on SUNE's purported ability to continuously develop renewable energy projects that could be "dropped down" to TERP and GLBL at favorable rates of return.  As the majority owner of both yieldcos, SUNE asserted it would reap the financial rewards of the projects it developed.

3.     SUNE told investors that it had sufficient existing sources of capital to acquire and develop renewable energy projects at levels that would support the dividend and growth estimates disseminated by defendants with respect to both GLBL and TERP.  The truth was – it did not. Moreover, defendants made such statements while failing to disclose SUNE's weakened liquidity position and its deteriorating borrowing capacity.  Defendants also neglected to disclose that SUNE had breached the debt covenants of one of its borrowing agreements and had been required to post hundreds of millions of dollars in additional collateral as a result.  Defendants likewise failed to disclose that SUNE had borrowed $169 million at an astonishingly high effective interest rate of 15% in desperation to raise the funds SUNE needed to acquire projects for GLBL and/or to cure the debt covenant breach.

- 1 -

4.     After Plaintiffs completed their purchases of SUNE and GLBL securities, defendants disclosed the debt covenant breach, margin calls and high interest rate borrowing.  Defendants also admitted that SUNE lacked the liquidity necessary to fund the development of the very projects that GLBL's dividend and growth forecasts were dependent upon.   SUNE promptly cancelled the acquisition, development and sale of numerous projects that were to be owned or operated by GLBL due to the lack of liquidity necessary to complete them.  Plaintiffs have suffered substantial harm as a result of their purchases of SUNE and GLBL securities.

## JURISDICTION AND VENUE

5.     This Court has original subject matter jurisdiction under the California Constitution, Article VI, §10, and pursuant to §22 of the Securities Act of 1933 ("1933 Act") with respect to claims asserted under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77(k), 77l(a)(2) and 77(o).  Removal is barred by §22 of the 1933 Act.

6.     This Court has personal jurisdiction under California Code of Civil Procedure §410.10 because defendants and their agents prepared the offering documents and affirmatively solicited the sale of the subject securities in and from California and those contacts with California have a substantial connection to the claims alleged herein.  The violations complained of herein arise from acts that occurred in, emanated from, or were authorized within this County, including through the involvement of defendants or their representatives or alter egos who reside in, conduct business in, are headquartered in, or have their principal places of business in this County.  In addition, some of the securities that are the subject of this action were sold in this County.

7.     Venue in this Court is proper under California Code of Civil Procedure §§395 and 395.5 because, *inter alia*, several defendants reside in this County.

## PARTIES

### A.     Plaintiffs

8.     Plaintiffs Omega Capital Investors, L.P., Omega Capital Partners, L.P., Omega Equity Investors, L.P. and Omega Overseas Partners, Ltd. are investment funds managed by Omega Advisors, Inc. ("Omega" or "Plaintiffs").  Omega purchased, acquired and/or sold SUNE and GLBL securities as

- 2 -

1   described herein, including SUNE preferred stock, GLBL Class D units and GLBL common stock, and

2   sustained damages as a result thereof.

**B.      Company Defendants**

4          9.      Defendant SunEdison, Inc. ("SUNE") is a company in the business of designing,

5   constructing and operating solar, wind, hydroelectric and other renewable energy power plants.  In

6   October 2011, SUNE moved its global power headquarters from Maryland to Belmont, California,

7   within this County, from where it oversees the research, construction and development of worldwide

8   renewable energy projects.

9          10.     Defendant TerraForm Global, Inc. ("GLBL") is an owner and operator of renewable

10  energy projects developed or acquired by SUNE, its controlling shareholder and sponsor.  GLBL

11  became a public company upon the completion of its SUNE-sponsored initial public offering ("IPO")

12  on July 31, 2015.  GLBL is the direct successor in interest to TerraForm Global LLC.[1]  SUNE controls

13  98% of the voting rights in GLBL through its ownership of all of the outstanding shares of GLBL Class

14  B common stock.  Each share of Class B common stock entitles SUNE to 100 votes on all matters

15  presented to shareholders, as compared with 1 vote for each share of Class A common stock.  SUNE

16  directly appoints the members of GLBL's board of directors, the majority of whom are current or

17  former SUNE executives or employees.  SUNE also controls the day-to-day operations of GLBL

18  through a Management Services Agreement, as described below.  GLBL is a "controlled company"

19  within the meaning of the corporate governance standards of the NASDAQ Global Select Market. By

20  virtue of SUNE's ownership and contractual interests and voting rights in GLBL, and the manner in

21  which it exercises those rights, SUNE dominates and controls GLBL, causing GLBL to function as an

22  instrumentality and alter ego of SUNE.

23         11.     SUNE and GLBL solicited the investing public to purchase securities issued pursuant to

24  the offering documents, hired and assisted the underwriters, prepared, reviewed and contributed to the

25  offerings and offering documents, and participated in road shows and other promotions to meet with

26  _____
    [1]   "GLBL" refers in context to its immediate predecessors, TerraForm Global LLC (with respect to
27  actions or events taking place from May 7, 2009 to the commencement of the July 31, 2015 public
    offering) and SunEdison Emerging Markets Co. (with respect to actions and events taking place prior to
28  May 7, 2009).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  and present favorable information to potential investors, including Plaintiffs named herein, all

2  motivated by their own financial interests.

3      12.  Defendants SUNE and GLBL are referred to herein as the "Company Defendants."

4  **C.    Individual Defendants**

5      13.  Defendant Ahmad Chatila ("Chatila") was, at all relevant times, the President, Chief

6  Executive Officer ("CEO") and a director of SUNE, the Chairman of the Board of GLBL and a director

7  of TERP. Chatila is a citizen of California.

8      14.  Defendant Brian Wuebbels ("Wuebbels") was, at all a relevant times, the Executive Vice

9  President, Chief Administrative Officer, and Chief Financial Officer ("CFO") of SUNE, and a director

10  of both GLBL and TERP.

11      15.  Defendant Carlos Domenech Zornoza ("Domenech") was, at all relevant times, the CEO

12  and a director of both GLBL and TERP. Domenech had previously served as an executive officer of

13  SUNE.

14      16.  Defendant Martin Truong ("Truong") was, at all relevant times, the Senior Vice

15  President, General Counsel and Secretary of SUNE and a director of both GLBL and TERP.

16      17.  Defendant Jeremy Avenier ("Avenier") was the CFO of GLBL until October 9, 2015,

17  when he left GLBL to return to SUNE. Avenier is a citizen of California and resides in Redwood City,

18  within this County.

19      18.  Defendants Chatila, Wuebbels, Domenech, Truong and Avenier are collectively referred

20  to herein as the "Individual Defendants."

21      19.  Defendant Alejandro "Alex" Hernandez ("Alex Hernandez") was CFO of TERP from

22  September 2014 until October 9, 2015, when he left TERP to become Executive Vice President and

23  CFO of GLBL.

24  **D.    Director Defendants**

25      20.  Defendant Emmanuel Hernandez ("Hernandez") was, at all relevant times, the Chairman

26  of the Board of SUNE. Hernandez is a citizen of California.

27      21.  Defendant Antonio R. Alvarez ("Alvarez") was, at all relevant times, a director of

28  SUNE. Alvarez is a citizen of California.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

22.     Defendant Peter Blackmore ("Blackmore") was, at all relevant times, a director of SUNE. Blackmore is citizen of California and resides in Atherton, within this County.

23.     Defendant Clayton Daley Jr. ("Daley") was, at all relevant times, a director of SUNE.

24.     Defendant Georganne Proctor ("Proctor") was, at all relevant times, a director of SUNE. Proctor is a citizen of California.

25.     Defendant Steven Tesoriere ("Tesoriere") was, at all relevant times, a director of SUNE.

26.     Defendant James B. Williams ("Williams") was, at all relevant times, a director of SUNE. Williams is a citizen of California.

27.     Defendant Randy H. Zwirn ("Zwirn") was, at all relevant times, a director of SUNE.

28.     Defendants Hernandez, Chatila, Alvarez, Blackmore, Daley, Proctor, Tesoriere, Williams and Zwirn are collectively referred to herein as the "SUNE Directors."

29.     The defendants named in ¶¶13-17 and 20-27 signed the offering documents, solicited the investing public to purchase securities issued pursuant the offering documents, hired and assisted the underwriters, prepared, reviewed and contributed to the offerings and offering documents, and participated in road shows and other promotions to meet with and present favorable information to potential investors, including Plaintiffs, all motivated by their own and the Company Defendants' financial interests.

E.     **Underwriter Defendants**

30.     Defendant Goldman, Sachs & Co. ("Goldman") is an investment banking and financial services corporation that maintains offices and operations in California.  Goldman served as an underwriter of the GLBL IPO (as defined below) as well as a co-lead underwriter of the SUNE Preferred Offering (defined below).  Goldman also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

31.     Defendant J.P. Morgan Securities LLC ("JP Morgan") is an investment banking and financial services corporation that maintains offices and operations in California. JP Morgan served as a lead underwriter of the GLBL IPO as well as a co-lead underwriter of the SUNE Preferred Offering. JP Morgan also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

32.     Defendant Barclays Capital Inc. ("Barclays") is an investment banking and financial services corporation that maintains offices and operations in this County.  Barclays served as a lead underwriter of the GLBL IPO.  Barclays also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

33.     Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking and financial services corporation that maintains offices and operations in California.  Citigroup served as an underwriter of the GLBL IPO.  Citigroup also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

34.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking and financial services corporation that maintains offices and operations in this County.  Morgan Stanley served as an underwriter of the GLBL IPO as well as a co-lead underwriter of the SUNE Preferred Offering.  Morgan Stanley also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

35.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking and financial services corporation that maintains offices and operations in this County.  Merrill Lynch served as an underwriter of the GLBL IPO and a co-lead underwriter of the SUNE Preferred Offering.  Merrill Lynch also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

36.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment banking and financial services corporation that maintains offices and operations in this County.  Deutsche Bank served as an underwriter of the GLBL IPO and as co-lead underwriter of the SUNE Preferred Offering.  Deutsche Bank also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

37.     Defendant BTG Pactual US Capital LLC ("BTG") is an investment banking and financial services corporation that served as an underwriter of the GLBL IPO.  BTG also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

38.     Defendant Macquarie Capital (USA), Inc. ("Macquarie") is an investment banking and financial services corporation that maintains offices and operations in California.  Macquarie served as a co-lead underwriter of the SUNE Preferred Offering.

- 6 -

39.    Defendant MCS Capital Markets LLC ("MCS") is an investment banking and financial services corporation that served as an underwriter of the SUNE Preferred Offering.

40.    Defendants Goldman, JP Morgan, Barclays, Citigroup, Morgan Stanley, BTG, Deutsche Bank and Merrill Lynch served as Placement Agents for the pre-IPO sale of GLBL Class D securities, and are collectively referred to herein as the "GLBL Placement Agents."

41.    Defendants Goldman, JP Morgan, Morgan Stanley, Merrill Lynch, Deutsche Bank, Macquarie and MCS served as the underwriters of the SUNE Preferred Offering and are collectively referred to herein as the "SUNE Underwriters."

42.    The SUNE Underwriters participated in the violations complained of herein as detailed below:

(a)    The underwriters are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the offerings and shared tens of millions of dollars in fees collectively for doing so.

(b)    With respect to the SUNE Preferred Offering, defendant Goldman solicited Plaintiffs' participation therein.

(c)    The SUNE Underwriters also demanded and obtained an agreement from the Company Defendants and the other defendants to indemnify and hold the SUNE Underwriters harmless from any liability under the federal securities laws. They also made certain that the Company Defendants had purchased millions of dollars in directors' and officers' liability insurance.

(d)    Representatives of the SUNE Underwriters also assisted the issuers and other defendants in planning the offerings and had access to confidential corporate information concerning the Company Defendants' operations and financial prospects.

(e)    In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the SUNE Underwriters met with the Company Defendants' lawyers, management and top executives and engaged in "drafting sessions" for the SUNE Preferred Offering. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the offering; (ii) the terms of the offering, including the price at which the securities would be sold; (iii) the language to be used in the offering documents; (iv) what disclosures would be made in the offering

- 7 -

documents; and (v) what responses would be made to the SEC in connection with its review of the offering documents. As a result of those constant contacts and communications between the SUNE Underwriters and the Company Defendants' management and top executives, the SUNE Underwriters knew of, or in the exercise of reasonable care should have known of, the existing yet undisclosed conditions and material risks detailed herein.

43. The SUNE Underwriters caused certain of the offering documents to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those purchased by Plaintiffs.

**F.      Doe Defendants**

44. The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1-25, inclusive, are presently not known to Plaintiffs, who therefore sue these defendants by such fictitious names. Plaintiffs will seek to amend this complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by Plaintiffs.

## BACKGROUND TO THE OFFERINGS

**A.      SUNE Takes on Billions of Dollars in Debt as It Transforms Itself into a Renewable Energy Project Developer**

45. Between 2013 and 2015, SUNE transformed itself from a manufacturer of semiconductors used in solar panels to a developer of large scale solar, wind, hydroelectric and other renewable energy projects for commercial and industrial customers. By mid-2015, the transition was largely complete, and SUNE was making preparations to sell off the remaining assets of its legacy semiconductor business.

46. As part of SUNE's new business model, it took on enormous debt to fund the development and construction of renewable energy projects. Between the outset of its business transition in the second quarter of 2013 ("2Q13") and 2Q15, SUNE's long-term debt climbed by nearly 300%, increasing from $2.4 billion to $9.2 billion.

47.     SUNE structured its financing to fund the development and operation of its renewable energy projects in a manner that relied on a complex series of financial transactions. SUNE's financing was designed to permit renewable energy projects to be developed and constructed using short-term financing and then be quickly sold to SUNE subsidiaries that would finance the acquisition through sales of stock or debt securities to investors. As projects were dropped down to its subsidiaries, SUNE's liquidity would then be freed up to pursue other projects.

48.     In 2014, SUNE formed its first yieldco, TERP, to own and operate solar and other renewable energy projects located in North America and Chile. TERP completed its IPO on July 18, 2014. Based on the apparent success of TERP, in November 2014, SUNE's senior insiders caused SUNE to announce that it would form a second yieldco, GLBL, to operate projects in emerging markets, including China, India and parts of Southeast Asia and South and Central America. GLBL completed its IPO on July 31, 2015.

49.     Both yieldcos are dominated and controlled by SUNE, its officers and its board of directors. The SUNE Directors used SUNE's ownership of more than 90% of the voting power of the yieldcos (through the ownership of Class B common stock) to install SUNE executives and other insiders as officers and a majority of the directors of GLBL and TERP. Under management services agreements with the yieldcos, SUNE is responsible for carrying out all day-to-day management, secretarial, accounting, banking, treasury, administrative, liaison, representative, compliance, regulatory and reporting functions and obligations. Pursuant to its Management Services Agreement with GLBL, SUNE, among other things, hires and supervises GLBL's employees; oversees the preparation of GLBL's books and records and financial statements; oversees GLBL's accountants, legal counsel and other accounting, financial or legal advisors; and arranges for individuals to carry out the functions of the principal executive, accounting and financial officers of GLBL for purposes of applicable securities laws and the regulations of any stock exchange on which GLBL securities are listed. SUNE also finances, supports and controls GLBL's operations through other contractual arrangements with GLBL, including a Support Agreement, Project Investment Agreement, Repowering Services Agreement and Interest Payment Agreement.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

50.     The yieldcos were designed to return most of the cash flow from the projects to investors in the form of dividends. SUNE was the sponsor of and retained a significant amount of the equity in the yieldcos. SUNE touted both yieldcos as "high growth" entities that would generate consistent and growing dividends from the projects SUNE would develop and drop down.

51.     SUNE asserted that the yieldcos would generate stable dividends due to the lower risk associated with renewable energy plants, which had contracted off-takes with relatively low maintenance costs and were not subject to rising fuel prices like traditional power plants. When GLBL was formed in mid-2015, defendants told investors that GLBL planned to return 85% of its annual cash available for distribution ("CAFD") to investors as dividends and projected it would be able to achieve a compound annual growth rate ("CAGR") in dividends per share ("DPS") of 20% over the three years following its IPO. SUNE and GLBL regularly disclosed CAFD "because," as stated in the registration statement used in connection with GLBL's IPO, "management recognizes that it will be used as a supplemental measure by investors and analysts to evaluate our liquidity."

52.     By virtue of its ongoing equity stake in the yieldcos, SUNE told investors it would continue to share in the cash flow generated by developed projects after they were dropped down to GLBL or TERP. SUNE's ownership interests in its yieldcos gave it the right to receive dividends and additional payments, called incentive distribution rights ("IDRs"), as performance targets were met. Yieldcos thus became the primary vehicle by which SUNE could monetize the projects in its development pipeline. SUNE repeatedly asserted that this retained indirect ownership of its renewable energy projects allowed it to realize greater value than it could by simply developing and selling the projects outright to third parties.

53.     To grow dividends, SUNE needed to be able to continue to develop and drop projects down to the yieldcos. To assure investors that it could do so, SUNE provided each yieldco with a "call rights list" that provided the yieldco with a right of first offer ("ROFO") on specified projects in SUNE's development pipeline. These lists could include projects SUNE had developed on its own as well as projects it had acquired from other entities. The projects on the call rights list, together with forecasts of other projects in SUNE's development pipeline, were used to provide investors with forecasts of CAFD, DPS and megawatt ("MW") growth.

- 10 -

54.     To succeed, SUNE's plan required that projects be dropped down at prices that would allow the yieldco to realize an internal rate of return ("IRR") in excess of its cost of capital and thereby result in spreads that would generate substantial CAFD per share and fuel dividend payments to investors. SUNE repeatedly told yieldco investors that SUNE would sacrifice sales margins on dropped down projects where needed to provide an IRR that would permit the yieldco to meet its CAFD and DPS growth targets. SUNE also told investors that such sales would increase the dividends and IDRs it received from its equity stake in the yieldcos by an amount that would exceed the value of foregone margins on such sales. SUNE also told investors that the increased dividends and IDRs it would receive from those projects as a result of its ownership stake in the yieldcos would exceed the value of any profits it sacrificed by selling the projects to yieldcos at prices that were lower than what it could have realized on the open market.

55.     The ability of the yieldcos to access equity and debt markets at attractive terms to fund project acquisitions from their parent was thus critical for SUNE given its highly leveraged balance sheet. The inability of the yieldcos to do so, or the inability of SUNE to drop projects down at high enough IRRs, would necessarily result in insufficient CAFD to fund expected dividend growth, stalling SUNE's growth, tying up its liquidity, and giving rise to risk of default on its borrowing arrangements. Thus, SUNE's balance sheet, capital structure, liquidity and financial strength were critical to potential investors.

56.     SUNE represented to investors that its liquidity and financial strength gave its Renewable Energy Development Segment, or "DevCo," the ability to finance the development or acquisition of projects that could be dropped down to GLBL and TERP at prices that provided an IRR that would generate CAFD sufficient to meet DPS growth forecasts. To further assure investors about its liquidity, in 2015 SUNE announced plans to launch more than $2.5 billion of warehouse financing facilities that could hold projects between the time they were completed and the time they were dropped down to one of the yieldcos. SUNE told investors that the warehouses protected the yieldcos from being forced to go to the capital markets when lending conditions were unfavorable and protected SUNE from having its liquidity tied up in completed projects awaiting acquisition.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

57.     In fact, by the summer of 2015, SUNE's liquidity was significantly worse than publicly represented. Contrary to defendants' representations, SUNE lacked sufficient liquidity to acquire and construct the projects needed to meet its growth estimates, or to drop those projects down to its yieldcos to meet their forecast CAFD and DPS estimates. Moreover, the price of the yieldcos' stock had declined, and their ability to access the financial markets at economic rates of return had declined, significantly worsening SUNE's liquidity position and eliminating its ability to meet the MW, CAFD and DPS growth estimates defendants had led the market to expect. Despite this, and even as SUNE breached the debt covenants in its borrowing agreement and found itself needing to borrow acquisition funds at an effective interest rate of nearly 15% (or a rate equal to 1,700% of the going 1-year LIBOR rate), defendants continued to misrepresent the strength of SUNE's liquidity, which permitted it to raise more than $2.5 billion by selling SUNE and GLBL securities to Plaintiffs and other investors.

**B.     SUNE Leverages Its TERP Interests to
         Obtain a $410 Million Margin Loan**

58.     On January 29, 2015, SUNE completed the $2.4 billion acquisition of First Wind LLC. Funding for the acquisition included a $410 million two-year loan (the "Margin Loan") from Deutsche Bank AG, Goldman Sachs Lending Partners LLC, Barclays Bank plc, Morgan Stanley Bank, N.A. and MIHI LLC. Goldman also served as a broker on the deal. Additional acquisition financing was provided by the sale of $337 million SUNE 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes").

59.     SUNE was the exclusive owner of TERP's Class B shares, which were convertible to shares of TERP's publicly traded Class A common stock. Both the Margin Loan and the Exchangeable Notes were secured by SUNE's interests in TERP Class B securities, consisting of its 62.7 million shares of Class B stock, Class B units and IDR rights in TERP. Specifically, with respect to the Margin Loan, SUNE initially pledged 32.2 million shares of its Class B stock and units and 50% of its IDRs as collateral. Both agreements also required SUNE to post additional collateral if the value of the Class B securities – as measured by the public trading price of TERP Class A stock – fell below specified levels.

60.     The Margin Loan provided for debt covenants that required: (i) the value of TERP common stock to remain above a specified value (the "Market Value Trigger"); and (ii) the loan-to-

- 12 -

1   value ratio of TERP common stock relative to the total borrowings under the loan be maintained above

2   a specified level (the "Margin Trigger Level").  If TERP's stock price fell below the Market Value

3   Trigger, SUNE was required to **prepay in full** all outstanding indebtedness on the loan **the next**

4   **business day**.  If the loan-to-value ratio exceeded the Margin Trigger Level, SUNE was required to

5   either prepay the loan or provide additional cash collateral to bring the Margin Trigger Level down to

6   the permitted level by 5 p.m. on the second business day after the limit was exceeded.  In addition, by 5

7   p.m. of the first business day after the covenant violation, SUNE was required to provide an irrevocable

8   notice of its intent to either prepay the loan or post additional collateral, along with "a description, in

9   reasonable detail of the source of such prepayment and/or such Margin Cash Collateral."

10         61.   The Market Value Trigger, Margin Trigger Level and related terms of the agreement

11   (including the "Margin Initial Level," "Margin Reset Level" and "Margin Release Trigger") were

12   defined in a side letter agreement that was **not** publicly disclosed or privately provided to Plaintiffs.

13   SUNE's 1Q15 Report on Form 10-Q filed with the SEC on May 7, 2015 stated that the loan required

14   SUNE to maintain a loan-to-value ratio not to exceed 50% (meaning it had to post at least $2 in

15   collateral for each $1 borrowed under the agreement).

16         62.   Neither the 1Q15 Report on Form 10-Q nor any other publicly filed document specified

17   the collateral values or the method of their calculation with sufficient specificity to permit Plaintiffs or

18   other investors to determine at what stock price the Margin Trigger Level or Market Value Trigger or

19   other debt covenants would be breached.

20         63.   The Margin Loan and Exchangeable Notes were also falsely classified in SUNE's 1Q15

21   and 2Q15 Reports on Form 10-Q as debt that was "Non-recourse to SunEdison." SUNE's 3Q15 Report

22   on Form 10-Q later corrected the entries to identify both agreements as recourse debt, thereby admitting

23   that defendants had understated the amount of SUNE's recourse debt by $740 million on its prior

24   financial statements.

25   **C.   SUNE Prepares to Launch GLBL by Selling $510 Million in**
     **Preferred Class D Securities and Taking on More than $1 Billion in Debt**

26

27         64.   On May 7, 2015, SUNE announced the GLBL IPO and filed with the SEC a preliminary

28   registration statement on Form S-1 (the "GLBL Class D Registration Statement").

- 13 -

65.     The GLBL Class D Registration Statement repeatedly emphasized the purported advantages of GLBL's relationship with SUNE, including that GLBL would "have access to the significant resources of our Sponsor to support the high-growth strategy of our business." The GLBL Class D Registration Statement represented that the company would "[m]aintain sound financial practices" and "maintain [its] commitment to disciplined financial analysis and a balanced capital structure," including through "a financing policy focused on achieving an optimal capital structure through various capital formation alternatives to minimize interest rates, refinancing risks and tax withholdings." It also emphasized SUNE's asset development track record, including its expertise in acquiring and financing renewable energy project developments since TERP was formed, and included a detailed "call rights list" identifying the projects SUNE would acquire to form GLBL's start-up portfolio and permit GLBL to post similar growth.

66.     The GLBL Class D Registration Statement did not disclose that SUNE lacked the liquidity to acquire the projects for GLBL's start-up portfolio, or that it had falsely identified approximately $740 million of its long-term debt as non-recourse obligations.

67.     Also on May 7, 2015, SUNE announced that it had raised $175 million by selling 175,000 Class D units ("GLBL Class D Securities") to three institutional investors. SUNE said it would use the proceeds of the GLBL Class D offering, together with $362 million in non-recourse debt financing announced the same day, to acquire solar and wind power assets in Brazil and elsewhere to form GLBL's initial portfolio of projects.

68.     On May 11, 2015, additional funding for GLBL's start-up portfolio was announced when SUNE said it would sell $750 million in convertible senior notes to acquire projects for GLBL and set up a warehouse financing facility.

69.     On or about June 9, 2015, Plaintiffs (along with other GLBL Class D Securities purchasers) purchased GLBL Class D Securities in the GLBL Class D offering. In connection therewith, Plaintiffs signed and entered into a Unit Purchase Agreement for the purchase of GLBL Class D Securities with GLBL (the "GLBL Class D Purchase Agreement"), a Third Amended and Restated Limited Liability Company Agreement (the "GLBL LLC Agreement"), and related agreements. The agreements provided for the purchase of 335,000 GLBL Class D Securities at a price

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  of $1,000 per share, raising $335 million that was to be used to purchase renewable energy project

2  assets for GLBL's initial project portfolio or pay off project debt.

3      70.    In §4 of the GLBL Class D Purchase Agreement, GLBL represented and warranted, as a

4  material inducement to Plaintiffs' purchase of GLBL Class D Securities, that the GLBL Class D

5  Registration Statement did not contain any material misstatements or omissions and that there had been

6  no material changes in the company's business since December 31, 2014.

7      71.    Section 9.10 of the GLBL LLC Agreement provided that, upon the completion of

8  GLBL's IPO, GLBL had discretion to convert the GLBL Class D Securities into shares of GLBL

9  common stock using a conversion ratio that provided holders with a 5% discount from the public IPO

10  price.  If the securities were not converted by May 5, 2019, GLBL could thereafter elect to repurchase

11  the units at the greater of their liquidation or fair market value.  The parties also entered into a Lock Up

12  Agreement and a Registration Rights Agreement providing that: (i) any converted shares received by

13  GLBL Class D Securities holders would be in the form of Rule 144 restricted (unregistered) stock that

14  could not be publicly traded until six months after the public offering; and (ii) thereafter, the holders of

15  converted restricted stock could demand, subject to certain conditions and requirements, that GLBL

16  register and offer their shares for public sale.

17      72.    On June 16, 2015, SUNE publicly announced the GLBL Class D offering in which

18  Plaintiffs participated.  SUNE also announced that it had entered into an agreement to raise an

19  additional $67.5 million through a placement of its Class A common stock that would be completed at

20  the time of its IPO for those shares.

21  **D.   SUNE Incurs Billions of Dollars in Debt and Obligations to Acquire
          Projects to Drop Down to GLBL and TERP and Misrepresents**

22  **      that It Has Ample Liquidity to Do So**

23      73.    On June 16, 2015, SUNE announced it had signed an agreement to acquire Continuum

24  Wind Energy Limited, which owned 412 MW of wind power projects operating and under development

25  in India and 1,000 MW of wind projects under development.  In a separate announcement the same day,

26  SUNE announced that it would acquire Globeleq Mesoamerica Energy, owner of 405 MW of wind and

27  solar projects operating or under development in Central America and 246 MW of wind projects under

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  development. SUNE said that all of the projects from both acquisitions were to be placed on the GLBL
2  call rights list. Terms of and financing arrangements for the transactions were not announced.

3       74.     On June 29, 2015, SUNE announced that it had acquired 521 MW of wind power plants
4  located in Idaho and Oklahoma from Atlantic Power and had formed a $525 million warehouse
5  financing facility to hold the assets pending dropping them down to TERP. The warehouse was
6  structured by Goldman, Morgan Stanley and Citigroup to provide financing for the acquisition via a
7  seven-year term loan funded by Macquarie, John Hancock and SUNE. SUNE CFO Wuebbels was
8  quoted in the release as stating that the warehouse "provides repeatable and scalable funding," and
9  SUNE expected to add additional warehouse facilities to house future acquisitions.

10       75.     On July 6, 2015, SUNE announced a $2 billion agreement to acquire 930 MW of wind
11  power plants from Invenergy Wind LLC. The agreement called for TERP to acquire 460 MW through
12  a combination of cash on hand and bond financing and assume $450 million in project debt. The
13  remaining 470 MW was to be acquired by a new SUNE warehouse financing facility, to be held for
14  later drop down into TERP. TERP raised its 2016 dividend guidance from $1.53 to $1.70 based on the
15  acquisition, representing 26% growth over its 2015 dividend.

16       76.     On July 15, 2015, GLBL entered into an agreement to acquire the rights to three wind
17  and hydropower projects in Brazil from Renova Energia for cash and GLBL common stock upon the
18  completion of GLBL's IPO. The transaction was initiated in May 2015 when GLBL signed a sale and
19  purchase agreement for the three Renova projects. In connection with GLBL's IPO, GLBL committed,
20  subject to certain conditions, to acquire 12 additional Brazilian wind and hydro projects from Renova
21  over the following four years. GLBL also acquired a 15% ownership interest in Renova from Light
22  Energia, S.A. for $250 million, payable in shares of SUNE common stock. SUNE publicly announced
23  the deal on July 21, 2015.

24       77.     On July 20, 2015, SUNE announced the $2.2 billion acquisition of U.S. residential solar
25  installer Vivint Solar ("VSLR"). In connection with the announcement, SUNE forecast that it would
26  complete 4.2-4.5 gigawatts ("GW") of projects in 2016, a roughly 50% increase from previous guidance
27  of 2.8-3.0 GW. The VSLR deal called for TERP to finance $922 million of the acquisition price for
28  cash by issuing $737 million in common stock to the public and borrowing $225 million to acquire 523

1  MW of VSLR solar system assets.  The remainder of the financing was to be provided by SUNE
2  through a $500 million secured debt facility, the issuance of $370 million in common stock, $350
3  million in convertible notes and $57 million in cash.

4       78.   Negotiations to finalize the terms of the VSLR acquisition were underway before the
5  June 9, 2015 sale of GLBL Class D Securities to Plaintiffs.  The VSLR acquisition was originally
6  proposed by Domenech in a phone call with VSLR's CEO on March 6, 2015.  Transactional due
7  diligence for the transaction commenced by March 26, 2015.  Following negotiations in May 2015,
8  SUNE submitted an offer to acquire VSLR on June 3, 2015, and proposed an exclusive negotiating
9  period to finalize the terms of the transaction.  After further negotiations leading to a preliminary
10  agreement on the acquisition price, on June 8, 2015 – the day before the closing of the GLBL Class D
11  offering – SUNE and VSLR signed a confidentiality agreement opening a four-week exclusive period to
12  finalize the deal terms.  During those negotiations, SUNE told VSLR that it lacked the liquidity
13  necessary to complete the transaction on the terms agreed and would need to obtain substantial
14  additional financing in order to consummate the transaction. Notwithstanding the foregoing, SUNE did
15  not negotiate a financing contingency or condition.  Neither did it disclose the insufficiency of its
16  liquidity to Plaintiffs or other investors.

17       79.   The July 20, 2015 announcement of the VSLR acquisition described the substantial
18  financing that would be required to permit the merger to go forward, causing some investors to question
19  whether SUNE had the ability to raise the capital needed to complete the merger and also fund the
20  acquisition, development and construction of the other projects needed to meet the high-growth
21  expectations it had set for GLBL and TERP, and to do so on terms that would permit completed
22  projects to be dropped down to the yieldcos at IRRs that would be sufficient to fund the CAFD and DPS
23  growth defendants had led the market to expect.  Market concern over the acquisition was heightened
24  by the increased risks associated with residential solar, which was a significant shift in SUNE's existing
25  business that targeted commercial and industrial projects that had stronger counterparties and less risk.
26  TERP's failure to raise dividend guidance to the level that was imputed by the combined assets of
27  VSLR and TERP further fueled concerns over the transaction.  These and other concerns over the deal
28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  caused the price of both SUNE and TERP shares to decline significantly following the announcement of
2  the VSLR acquisition.

3        80.    By the end of trading on July 21, 2015, the price of SUNE common stock had fallen
4  nearly 7% from its pre-announcement level to close at $29.37 per share while the price of TERP shares
5  had fallen by more than 9% to close at $33.71 per share.

6        81.    Continued declines in the price of SUNE and TERP shares led TERP to announce on
7  July 27, 2015 that it would not issue new shares to finance the acquisition, but would instead do so with
8  a combination of cash on hand and increased debt.  To further allay concerns, a conference call was
9  convened that day in which TERP's CEO Domenech and CFO Alex Hernandez (a former Managing
10 Director in the Investment Banking Division of Goldman) represented to investors that TERP and
11 SUNE had adequate liquidity to carry out all of the recently announced acquisitions.  Alex Hernandez
12 asserted that TERP shares were "significantly undervalued" as a result of recent market activity, which
13 had resulted from "misconceptions [about the VSLR acquisition] that are apparent from a number of
14 inquiries we have received."  He asserted that the company had "ample liquidity and a conservative
15 capital structure," "full flexibility to deploy this liquidity to fund the pending transactions and the
16 overall growth of our business," and the ability to do so "in a disciplined manner that is consistent with
17 our financial policy and strategic objectives."  Alex Hernandez also confirmed that TERP had sufficient
18 cash flow to meet both its 2015 and 2016 dividend and CAFD guidance without issuing additional
19 equity, asserted that its dividend forecasts were conservative, and claimed that its CAFD forecasts for
20 the transaction were still reliable despite the increased debt required by the restructured deal announced
21 on the call.

22       82.    By the close of trading on July 31, 2015, the price of both SUNE and TERP shares fell to
23 $23.28  per  share  and  $30.16  per  share,  respectively,  triggering,  or  causing  an  imminent  risk  of
24 triggering, a substantial margin call on the Margin Loan, which fact was not disclosed to investors.

25 E.    **As Its Liquidity Deteriorates, SUNE Proceeds with the GLBL IPO**

26       83.    On July 19, 2015, GLBL filed an amended registration statement in connection with the
27 GLBL IPO.  The registration statement asserted that GLBL would be a "high growth" company that
28 would distribute 85% of its CAFD as dividends to investors, starting with an initial quarterly dividend

1   of $0.275 per share ($1.10 per year) and growing its dividends by a 20% CAGR based on the strength

2   of SUNE's liquidity and capital resources and its ability to continuously acquire, develop and construct

3   renewable energy projects to add to GLBL's portfolio.

4         84.    On July 29, 2015, GLBL sent letters to the SEC requesting acceleration of the effective

5   date of the registration statement to July 30, 2015, at 4 p.m., or as soon thereafter as possible. At the

6   time the request for acceleration was submitted, defendants were aware or should have known that

7   SUNE's 2Q15 results would be significantly below market expectations, as described below. They

8   were aware or should have known of the breach or impending breach of the Margin Loan debt

9   covenants and/or declined to disclose SUNE's inability to meet the margin call on the loan without

10  borrowing to do so.

11        85.    Following the July 19, 2015 announcement, GLBL, SUNE and GLBL's underwriters

12  immediately commenced a road show seeking to encourage investors to participate in the GLBL IPO

13  and a related bond offering.  A team of company representatives, including Alex Hernandez, TERP

14  CFO; Avenier, GLBL CFO; Manu Sial, SUNE Senior Vice President of Finance; and Robert Morris,

15  SUNE Vice President of Investor Relations, solicited investors in a teleconference call on July 23, 2015

16  and during presentations in London on July 22, 2015, New York on July 23 and 24, 2015, Boston on

17  July 27, 2015, Los Angeles on July 28, 2015 and July 29, 2015, and San Francisco on July 29, 2015.

18  Another team of representatives, including Kevin Lapidus, SUNE Senior Vice President, and Adam

19  Kuehne, GLBL Director of Capital Markets, solicited investors during presentations in Hong Kong on

20  July 21, 2015 and Singapore three days later.

21        86.    During the July 20-29, 2015 road show ahead of the offering, SUNE continued to

22  represent to investors that it had sufficient liquidity to run its business.

23        87.    The registration statement for the IPO, as amended, was declared effective on July 31,

24  2015 (the "IPO Registration Statement").  On August 4, 2015, GLBL filed with the SEC the prospectus

25  for the IPO (the "IPO Prospectus" and, together with the IPO Registration Statement, the "IPO Offering

26  Materials").  As set forth in more detail in ¶¶193-196, 199, 201, 203, 205, the IPO Offering Materials

27  emphasized that GLBL was a "high growth" company primed to rapidly expand its business and grow

28  dividends by 20% annually as a result of its access to SUNE's financial resources, its ability to raise

1    capital, its experience in structured financing for the acquisition and development of renewable energy

2    projects, and its commitments to develop projects that would permit GLBL to attain its targeted growth.

3         88.      The IPO Offering Materials contained untrue statements of material fact and omitted

4    other material facts necessary to make the statements made therein not misleading, including:

5              (a)      that SUNE had already agreed to structure the 15% Goldman Loan (as defined

6    below) to acquire projects for GLBL's start-up portfolio;

7              (b)      that the debt covenants in the Margin Loan had been breached, or were in

8    imminent danger of being breached;

9              (c)      that SUNE lacked sufficient cash to meet the operating needs of its business;

10             (d)      that SUNE lacked sufficient liquidity to acquire the projects that were to form

11    GLBL's initial start-up portfolio; and

12            (e)      that even where the offering materials purported to warn investors of risks to

13    GLBL's success, those "risk disclosures" were themselves misleading as they described the "risks" as

14    contingent on uncertain future events when, in fact, the events warned of had already come to pass.

15         89.      On July 31, 2015, defendants raised almost $1.5 billion in the IPO and a GLBL bond

16    offering, selling 45 million shares of GLBL Class A common stock at $15 per share in the IPO for gross

17    proceeds of $675 million (the "GLBL IPO") and selling an additional $810 million of 9.75% GLBL

18    bonds.

19         90.      Also on July 31, 2015, GLBL's board exercised its discretion under §9.10(c) of the

20    GLBL LLC Agreement to force Plaintiffs to surrender their GLBL Class D Securities in exchange for

21    restricted shares of GLBL common stock. GLBL required Plaintiffs and all other holders of GLBL

22    Class D Securities to tender their Class D units to GLBL for conversion to shares of GLBL restricted

23    common stock. Pursuant to this requirement, Plaintiffs sold their GLBL Class D Securities to GLBL

24    according to the formula set forth in the GLBL LLC Agreement and were required to simultaneously

25    use the proceeds to purchase shares of restricted GLBL common stock.

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

**F.      Unbeknownst to Investors SUNE Borrows $169 Million from Goldman at an Astounding 15% Interest Rate to Finance the Acquisition of GLBL's Start-up Projects**

91.      On August 11, 2015, SUNE entered into an agreement for a one-year term loan from Goldman Sachs Bank USA to borrow $169 million at a rate of 9.25% and pay the lender an origination fee of $9 million (5.3%), equating to an effective interest rate of 15% (the "15% Goldman Loan"), *or more than 14 percentage points over the then-prevailing LIBOR one-year rate of 0.8467%.* By comparison, the credit facilities adequately disclosed in SUNE's 2Q15 Report on Form 10-Q required the company to pay from 1.25 percentage points to 4.25 percentage points over LIBOR.

92.      Neither the existence of the loan nor its terms were disclosed publicly or to Plaintiffs until three months later on November 9, 2015, when SUNE filed its 3Q15 Report on Form 10-Q, which described the loan as follows:

> On August 11, 2015, we entered into a Second Lien Credit Agreement ("Second Lien Term Loan") with Goldman Sachs Bank USA ("Goldman Sachs"), providing for a term loan maturing on August 11, 2016, in an aggregate principal amount of $169 million. As of September 30, 2015, the current interest rate on the Term Loan is 9.25%. . . . We paid fees of $9 million upon entry into the Second Lien Term Loan which were recognized as deferred financing costs.

93.      On November 18, 2015, Deutsche Bank reported that SUNE management had admitted that the 15% Goldman Loan had been "structured in July as part of the portfolio formation for the GLBL IPO. The company entered into the loan in August as part of the initial agreement in order to fund the construction of some of the international projects."

94.      Given the concerns in the market following the announcement of the VSLR acquisition, the disclosure that SUNE needed to borrow funds at 15% in order to fund construction of the projects in GLBL's start-up portfolio would have immediately alerted investors that the projects could not be economically dropped down at a cost that would allow GLBL to generate an IRR that exceeded its cost of capital and generate dividend yields or growth in the amounts forecast. As a result, Plaintiffs and others would have understood that GLBL lacked the ability to meet its MW, CAFD and DPS growth forecasts. That SUNE needed to borrow funds at a 15% rate was a tacit admission, or at a minimum a red flag, that the representations about SUNE's financial strength, liquidity and capital resources, and the benefits GLBL would derive as a result thereof, were false. As a result, demand for GLBL's IPO

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1   shares, which had already fallen significantly following the VSLR acquisition announcement, would

2   have dissipated along with demand for any subsequent offerings of SUNE securities.

3   **G.   Five Days After the GLBL IPO Is Completed, SUNE Reports a Widening**
        **Second Quarter Loss that Increases the Risk of a Margin Loan Default,**
4       **but Represents to Investors that Its Liquidity Remains Strong**

5       95.     On August 6, 2015, SUNE issued its 2Q15 financial results, reporting strong growth but

6   a net loss of $263 million ($0.93 per share), which was more than five times larger than the loss

7   reported in 2Q14. Even excluding one-time items, the $0.74 loss per share was significantly wider than

8   the $0.51 loss expected by analysts.

9       96.    On August 6, 2015, SUNE conducted a conference call with investors to discuss the

10  2Q15 results with investors, during which:

11          (a)    Chatila, Wuebbels, Domenech and Alex Hernandez spent the majority of the call

12  attempting to focus investors on the company's MW and DPS growth and representing to investors that

13  SUNE's existing liquidity sources were sufficient to fund operations and meet 2015 and 2016 financial

14  forecasts without additional offerings or borrowings.

15          (b)    Chatila, in reaction to investor concerns over potential increases in interest rates

16  and tighter capital markets, asserted at the outset of the call that SUNE's financial platform had been

17  designed so that "in times of dislocation like those recently seen in the YieldCo financing space" SUNE

18  could still provide "attractive growth" for the yieldcos "by providing drop-down projects at high IRRs

19  that are well above the vehicle's cost of capital."

20          (c)    Wuebbels repeatedly stated that SUNE had a "strong liquidity position," that

21  SUNE and TERP had $2 billion in cash and that "multiple pools of capital []are at our disposal to

22  continue to fuel our growth." Wuebbels concluded his opening remarks at the outset of the call by

23  telling investors that SUNE "can economically drop projects at a significant spread to [TERP's] cost of

24  equity and cost of capital" resulting in "IRRs well above its cost of capital," and that the "same type of

25  model holds for our ability as a developer to drop projects to [GLBL] at attractive spreads to its cost of

26  capital while still benefitting at the sponsor level as well."

27          (d)    Domenech stated that TERP's liquidity was "more than sufficient to support our

28  growth needed to reach 2016 targets."

- 22 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1        (e)    Alex Hernandez claimed that the company "operated with a conservative balance

2 sheet with debt levels well below target while also maintaining significant liquidity," and that "the

3 Company is in a very strong liquidity position and . . . our cost of funding remains low as a result of

4 this disciplined strategy." He also noted that "we purposely run the business so we can weather periods

5 of market dislocation," and said that the company's "current portfolio and announced acquisitions are

6 sufficient to deliver 2016 DPS in excess of our $1.75 guidance without incremental equity."

7        97.    Defendants maintained their bullish stance when analysts questioned their growth and

8 spending plans. For example, when one analyst asked whether defendants would need to raise equity to

9 fund SUNE's 2016 growth plans, Wuebbels responded by touting the company's financial strength and

10 expertise: "So we continue to add to the firepower of the Company, and I think that's the thing that you

11 would notice mostly with SunEdison, is that our ability to innovate on capital structures and on being

12 able to build out this growth in a capital efficient manner is what really differentiates us. And I think

13 that will continue." After repeated questioning by analysts as to whether additional financings would be

14 required to meet forecast growth, Wuebbels answered directly that no additional corporate financing

15 would be needed, noting that *"we don't see any additional financings to be able to achieve this

16 growth."* [2]

17       98.    Following these exchanges, Omega Chairman Lee Cooperman asked whether the

18 declining share price of SUNE and its yieldcos had given rise to "an opportunity for creating additional

19 value for shareholders by capitalizing on the short-term pessimism in the Market." In response, Chatila

20 and Wuebbels both strongly reaffirmed that the liquidity and financial strength of the company fully

21 supported their bullish outlook for the business:

22       [Cooperman:] Thank you. I must admit to having a certain amount of lack of
knowledge of your business, but I have a partner that's done a terrific job of staying on

23 top of you. My question really is more philosophical. There's a massive change in the
absolute and relative prices of a number of your entities you are involved with. Does

24 this create an opportunity for creating additional value for shareholders by capitalizing
on the short-term pessimism in the Market, or is our financial resources pretty much

25 earmarked for reinvestment in the business?

26       [Chatila:] Thank you, Lee. Thank you for joining us today. I will tell you two
things. Number one, in this kind of dislocation, the strong get stronger. We are a lot

27

28   [2]  Here as elsewhere emphasis has been added unless otherwise indicated.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

more well set, better set than other people. And you can see from our ability to develop organically, having the Yieldcos that we have, the only international Yieldco around in solar and wind. So because of that, we're very well set. The second thing I'll tell you is we are — the focus that I have on my mind is two things right now. Number one of course is to execute the next six quarters. And number two is to ensure the yield on TerraForm Power and TerraForm Global is impeccable. And we're going to ensure that the drop-downs are at a significant wide width of — versus the weighted average cost to capital of these vehicles. So we're going to continue to perform in that regard. I don't know, Brian, if you want add any comments.

[Wuebbels:] No, I think, Lee — I think you said it well. For us, these moments of dislocation provide opportunities. I think for us, though, the most important thing at this moment is execution. For us, we have been very successful in doing accretive acquisitions. But at moments like this for us the most important thing, I think it's what we tried to bring focus back on this call, was that the underlying operations of the Company are strong. It's what has gotten us to this point. We haven't taken our eye off the ball. We are integrating all of these assets extremely well. And the underlying fundamentals, whether it's the operation of the fleet within TerraForm Power or the execution of margins within SunEdison or the OpEx leverage that we're getting in SunEdison are unchanged. So to me, that's how I see it. I think we see opportunities in this space, and we're not going to stop.

[Chatila:] There's two ways to execute in business. Number one is to really do the operational execution, be focused, so on and so forth, [b]ut even a more important one is to design a formula that makes money all the time. So when you look at a lot of our acquisitions or change in structure, it's to give us the strategic depth to never miss. If you look actually how what [sic] Carlos and Alex have done in TerraForm Power, the way they have distributed the assets so well, because of that structure they're going to be better performing. And we will continue to do these kind of moats in our business all the time. So on the surface looks like it's a lot of things. Reality is we are de-risking the business as time progresses by having many sources of volume growth, many sources of cash flows, many vehicles so we can drop down our assets and never have to sell projects to other people and make less money. And that's why we feel very confident about our execution. Not only because of the operations, which we are maniacal about, but also the way we design the formula.

[Wuebbels:] I think the last piece, Lee, that I will mention is, we said this previously. As we get into the deeper parts of the dividends coming back to the parent and the IDRs, that clearly we're going to articulate to our shareholders the capital strategy of how we're going to return that capital to our shareholders, whether it's to be through a buyback or whether it's going to be through a dividend. So we're still working on that. The GP conversation, we didn't put a lot of focus on it during this call because we wanted to focus on execution, but that is still front and center. We have full intention, as we get into the IDRs, of returning that capital back to our shareholders.

99.     The statements quoted above, and other similar representations on the call, caused investors to believe that SUNE's liquidity and capital resources were sufficient to fund its operations and acquire the projects needed to support GLBL's and TERP's promised growth, as reflected by analyst commentary after the call. *See, e.g., UBS, Assessing the Aftermath,* Aug. 7, 2015 ("Liquidity remains a further focus – mgmt likely to act to quickly expand credit. . . . Bottom line, this appears

- 24 -

1  more of a perception than a reality . . . ."); *see also* Deutsche Bank, *Panic Selling Creates Great Buying*

2  *Opportunity*, Aug. 11, 2015; Credit Suisse, *Addressing Bear Thesis Head On: SunEdison Has Access to*

3  *Capital to Generate Returns*, Aug. 12, 2015; RBC Capital Markets, *Well prepared to weather a perfect*

4  *storm*, Aug. 13, 2015.

5  **H.     SUNE Does Not Disclose a Breach of the Debt Covenants on the Margin Loan**

6        100.    The falling price of SUNE and TERP shares following the July announcement of the

7  VSLR acquisition prompted large margin calls on the Margin Loan.  By August 4, 2015, two days

8  before 2Q15 earnings were announced, TERP shares had fallen nearly 14% below their value on the

9  day the Margin Loan was closed.  Thus, by the time of the 2Q15 call, the breach of the Margin Loan

10  debt covenants had either already occurred or was imminent.

11        101.    The margin call was not publicly disclosed by SUNE at the time it occurred.  On August

12  25, 2015, UBS reported that it had learned that a margin call had been made on the loan but had been

13  satisfied by SUNE and that UBS presumed it had been satisfied by pledging additional Class B shares

14  as collateral.  SUNE did not file a Report on Form 8-K with the SEC as required at the time it advised

15  UBS of the Margin Loan breach and margin call and did not itself report the margin call until October

16  7, 2015, when it admitted that a $152 million call had previously been made on the Margin Loan and

17  was satisfied by posting cash, not shares, as additional collateral.

18        102.    While defendants did not disclose the source of the cash used to satisfy the call, the

19  following facts indicate that the margin call was satisfied from the proceeds of the 15% Goldman Loan:

20  (i) the 15% Goldman Loan was signed August 11, 2015, which would have been the deadline set by the

21  Margin Loan agreement to cure the violation if the breach occurred on August 7, 2015[3]; (ii) the size of

22  the loan ($169 million) is roughly the same as the size of the call ($152 million), which is consistent

23  with the need to post additional collateral to provide a cushion to prevent further calls as the value of

24

25  [3]     Based on the 50% loan-to-value requirement and using the value of the Class B shares pledged to
    the loan (but not the value of the Class B units or IDR rights, which are unknown), the covenant appears
26  to have been breached on or about August 7, 2015, when TERP's shares closed at $25.24 per share.
    SUNE has not disclosed the specific date of the breach.  However, based on the 32.2 million Class B
27  shares originally pledged on the Margin Loan agreement and assuming a $410 million loan balance on
    August 7, 2015, the $25.24 closing price would have equated to a loan-to-value ratio of 50% ($410
28  million ÷ (32.2 million x $25.24)).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  TERP common stock continued to fall; and (iii) Goldman was one of the brokers and lenders on the

2  Margin Loan, and thus knew about the call and the need to raise money to satisfy it. To the extent

3  SUNE satisfied the call by using the proceeds of the 15% Goldman Loan, the disclosure of SUNE's

4  inability to satisfy the call absent borrowing funds at an extraordinary 15% interest rate would have

5  caused investors to disbelieve defendants' statements about the company's liquidity, efficient use of

6  capital and financial strength, and to discredit defendants' bullish outlook for the business.

7  **I.      SUNE Sells $650 Million in Preferred Stock Without**
   **Disclosing the 15% Goldman Loan, the Breach of the**

8  **Margin Loan and Worsening Liquidity Risks to Investors**

9        103.   On August 12, 2015, SUNE announced the syndication of an additional $280 million

10 seven-year term loan for the TERP warehouse facility. The proceeds were added to the warehouse

11 facility formed in connection with the Atlantic Power acquisition, increasing the warehouse facility to

12 $525 million. Later that day, SUNE announced that it would sell 50% of the cash equity (and 99% of

13 the tax equity) on a 420 MW solar project on TERP's call rights list (the Four Brothers project in Utah)

14 for $500 million to Dominion Resources to raise the capital needed to complete development and

15 construction of the project. Both of these announcements misrepresented that SUNE's financial

16 condition remained strong and it had the ability to raise the capital necessary to fund project

17 development and meet forecast MW, CAFD and DPS growth at its yieldcos, causing the price of both

18 SUNE and TERP shares to rise. SUNE did not disclose the terms or existence of the 15% Goldman

19 Loan or the margin call that had been made on the Margin Loan, resulting in a presentation that misled

20 Plaintiffs and other investors about SUNE's liquidity, access to capital and financial strength.

21       104.   On August 17, 2015, SUNE issued a release announcing a preferred stock offering. The

22 following day, SUNE filed a prospectus supplement (the "Preferred Offering Prospectus") to its

23 September 9, 2013 registration statement on Form S-3 (the "Shelf Registration," and together with the

24 Preferred Offering Prospectus, the "SUNE Preferred Offering Materials") for the $500 million offering

25 of series A perpetual convertible preferred stock ("SUNE Preferred Stock") carrying a 6.75% dividend

26 right (the "SUNE Preferred Offering").

27       105.   The SUNE Preferred Offering Materials contained untrue statements of material fact and

28 omitted other material facts necessary to prevent other statements made therein from being materially

- 26 -

1  misleading as set forth in more detail in ¶¶146-162 below.  Among other things, the SUNE Preferred

2  Offering Materials: (i) omitted to disclose the breach of the Margin Loan debt covenants; (ii) omitted to

3  disclose the existence or terms of the 15% Goldman Loan; and (iii) represented that SUNE's existing

4  sources of liquidity were sufficient to operate its business over the next 12 months and to develop the

5  renewable energy projects needed during that period to meet forecast MW, CAFD and DPS growth.

6       106.    Goldman solicited Plaintiffs' participation in the SUNE Preferred Offering.  Plaintiffs

7  agreed to and did purchase SUNE Preferred Stock in the SUNE Preferred Offering.

8       107.    On August 18, 2015, SUNE completed the SUNE Preferred Offering, issuing $650

9  million shares of SUNE Preferred Stock at the price of $1,000 per share.  Plaintiffs purchased SUNE

10  Preferred Stock from the SUNE Underwriters in the SUNE Preferred Offering.

11       108.    Had Plaintiffs known about the existence, reasons for, or terms of the 15% Goldman

12  Loan, they would not have purchased SUNE Preferred Stock.

13  **J.    SUNE's Liquidity Problem**

14       109.    On August 25, 2015, UBS issued an analyst report disclosing that a margin call had been

15  made on the Margin Loan.  The report, which stated that UBS had learned of the margin call in a

16  discussion with management, did not identify the size of the call, disclose the 15% Goldman Loan, or

17  explain how the call had been satisfied.  The report stated, in relevant part:

18            **Call on margin loan but still appears to be sufficient collateral**

19            Details on the $410Mn margin loan secured by SUNE's TERP LP and GP
20       interest remain scarce but we understand that there has been a margin call made which
         management has satisfied.  SUNE has taken steps to restructure the loan (we suspect
21       increasing TERP collateral) which it believes will prevent any disruptions to the
         business going forward.  The original loan agreement requires a 50% minimum loan-to-
22       value ratio implying $205Mn TERP value must be maintained (~9Mn LP shares).

23       110.    On August 31, 2015, Macquarie and JP Morgan initiated coverage on SUNE with
24  positive ratings.  Both analysts recognized questions about SUNE's liquidity, but concluded, based on

25  management's commentary, that the liquidity risks were overblown.  Macquarie said the Dominion

26  Resources joint venture agreement "should have addressed near-term liquidity concerns for SUNE

27  given its aggressive project development schedule" and dismissed opinions to the contrary as mere

28  speculation: "[G]iven SUNE's high leverage and liquidity concerns surrounding other renewable power

1  developers, the limited clarity of SUNE's disclosures tends to give rise to speculation about its financial

2  standing, especially during times of dislocation in financial markets, like right now." JP Morgan's

3  report similarly told investors that SUNE stock was undervalued, asserting that the new warehouse

4  facilities provided it with sufficient protection from the yieldcos' falling stock prices and inability to tap

5  capital markets. "Amid liquidity concerns, we are buyers," the report said, adding that the "Recent sell-

6  off [was] overdone."

7       111.   The following week (on September 8, 2015), SUNE announced that an agreement had

8  been reached to form a partnership with unnamed institutional investors advised by JP Morgan to

9  provide equity to purchase projects developed by SUNE at "an agreed upfront development margin."

10  Financial terms of the arrangement were not disclosed.  SUNE said that the partnership agreement

11  would provide $300 million to fund the purchase of a 33% interest in a 425 MW portfolio of solar

12  assets owned by Dominion Resources.  SUNE's press release went on to state:

13       The partnership also contemplates the acquisition of new development projects into
         mid-2016, providing an ongoing source of capital for SunEdison projects ready to go
14       into construction or operation.

15       "This partnership supports SunEdison's growth strategy while strengthening our
         liquidity," said Paul Gaynor, executive vice president of SunEdison's EMEA and
16       Americas business unit. "Attracting strong investors such as J.P. Morgan Asset
         Management reinforces the breadth and depth of demand for ownership of renewable
17       energy assets."

18       112.   Also on September 8, 2015, SUNE announced another joint venture agreement with

19  Dominion Resources to invest $320 million to develop the 265 MW Three Cedars solar project in Utah,

20  on terms similar to the previously announced joint venture on the Four Brothers project, and told

21  investors it would finance the balance of the capital through a loan from Deutsche Bank.

22       113.   Neither release disclosed the 15% Goldman Loan, or warned that further margin calls on

23  the Margin Loan had occurred or were imminent.

24       114.   A September 8, 2015 "Company Alert" issued by Deutsche Bank (the administrative

25  agent for, and one of the lenders on, the Margin Loan), rating SUNE stock as a "Buy" in light of the two

26  deals announced that day, stated:

27       Both these deals demonstrate SUNE's ability to finance their 2016 projects and
         increase our confidence in the company's ability to weather the market downturn while
28       executing on the 4.2-4.5GW guidance for 2016. Equity return requirements for the JPM

- 28 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  warehouse are likely in the 10-11% range, and we expect the company to pursue similar
2  arrangements for international emerging market projects over the coming quarters,
   although we think a country-specific fund is more likely for international assets.
3  Furthermore, almost 700MWdc of projects financed with Dominion Resources in
   several weeks show that there is still ample tax equity appetite in the market, and similar
4  deals with other large utilities are plausible through the end of 2016 should increase
   investor confidence in SUNE's ability to meet its guidance.  Furthermore, equity
5  investors appear willing to provide a source of liquidity for SUNE projects with the
   ability to scale, which should allay public investor concerns around financing abilities.

6  Deutsche Bank, *Deals Show SUNE's Financial Flexibility*, Sept. 8, 2015.

7      115.    On September 28, 2015, CreditSights issued a report warning that SUNE could be close

8  to a margin call on the Margin Loan.  After analyzing vague loan disclosures spread through four

9  disparate documents (a SUNE 10-Q, a TERP prospectus, a SUNE bond offering, and the Margin Loan

10 agreement), the report concluded that it was "possible" that SUNE could have to post additional

11 collateral on the loan, but warned that "clear lack of disclosure" made it difficult to reach any firm

12 conclusions: "It is entirely possible the company and lending bank disagrees with us and/or has

13 amended the loan but we have seen zero disclosure saying this is the case."

14     116.    In a September 29, 2015 research report, JP Morgan wrote that the decline in SUNE's

15 share price over the past week "has been driven primarily by concern over SUNE's $410mm margin

16 loan, collateralized by Class B shares of [TERP]."

17 **K.    SUNE Cancels Projects, Reveals the Margin Loan Breach**
   **and the 15% Goldman Loan, and Admits that It Had**
18 **Insufficient Liquidity to Meet the Growth It Forecast**

19     117.    On October 5, 2015, SUNE issued a release and filed a Report on Form 8-K with the

20 SEC announcing that on September 29, 2015, its board of directors had approved a management

21 proposal to restructure operations by cutting its workforce by 15%.  *Greentech Media* reported that the

22 initiative was designed to reduce operating costs by 30%.

23     118.    On October 6, 2015, *The Wall Street Journal* reported that SUNE would not complete its

24 $700 million acquisition of Latin America Power ("LAP") and had walked away from the deal after

25 failing to make a $400 million upfront payment.  SUNE told *The Wall Street Journal* that LAP had

26 failed to satisfy a condition precedent to the deal (consummation of a share purchase agreement), a

27 position that Chatila reiterated on a conference call the next day.  LAP's lawyer told *The Wall Street*

28 *Journal* that SUNE's contention was "'baseless.'"  LAP subsequently initiated arbitration to recover at

- 29 -

1   least $150 million from SUNE as a result of the cancellation of the deal, alleging that SUNE failed to

2   complete the acquisition because of "failed business strategies and lack of liquidity." LAP and SUNE

3   would later settle their disputes with SUNE paying LAP an additional $28.5 million.

4       119.    At 7 a.m. Eastern time on October 7, 2015, SUNE hosted a conference call to discuss the

5   state of its business with investors and market analysts.  Wuebbels admitted on the call that a $152

6   million margin call had been made on the Margin Loan (without disclosing the existence or terms of the

7   15% Goldman Loan that had been made at the time of the margin call) and that the margin call had been

8   satisfied by posting additional cash which was being held in escrow.

9       120.    Wuebbels also said that the loan had been restructured to lower the margin trigger "to a

10  point that is significantly below the current market price." Yet in SUNE's 3Q15 Report on Form 10-Q,

11  filed four weeks later on November 9, 2015, the Company revealed that it had suffered an ***additional***

12  margin call of $91 million in October.  But at the time Wuebbels made his October 7, 2015 statement,

13  TERP's stock had just closed at $17.88 per share (on October 6, 2015), and closed above that price on

14  every day for the rest of the month save one (October 27, 2015), when it closed slightly lower at $17.64

15  per share.  By contrast, the low for the month had occurred on October 1, 2015, five days before the

16  call, when TERP's stock closed at $15.32 per share.  Thus, Wuebbels either failed to disclose the fact

17  that a second margin call had occurred by the time he told investors that the collateral was sufficient, or

18  his assertion that the margin trigger had been reset to a point that was "significantly below the current

19  market price" was false.

20      121.    During the call, SUNE announced that due to the unavailability of financing it was

21  changing its strategy to focus on selling or long-term warehousing of projects, would not drop any

22  projects into TERP or GLBL in 2016, and lowered its 2016 MW guidance by 20%.  Chatila

23  nevertheless told investors that SUNE "remains well capitalized with adequate liquidity and the new

24  optimized economic engine positions us with cash-generating ability that exceeds the liabilities of the

25  business, including acquisitions and converts."

26      122.    Chatila acknowledged on the call that SUNE had been criticized for a lack of

27  transparency, admitting that "SunEdison's P&L and balance sheet are hard to read and we fully

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1   recognize that," and stating that the company would "improve our investor disclosure, reporting and

2   transparency to shed light on the quality of our business."

3       123.    On November 9, 2015, SUNE filed with the SEC its 3Q15 Report on Form 10-Q. At the

4   end of the note to its financial statements describing SUNE's DevCo debt, under the heading "Other

5   Credit Facilities," the 3Q15 Report on Form 10-Q revealed the 15% Goldman Loan to investors, as

6   quoted in ¶92 above. The Report on Form 10-Q also: (i) revealed that SUNE had been required to

7   deposit an additional $91 million in cash collateral on the Margin Loan in October 2015 (over and

8   above the $152 million call that was revealed on October 7, 2015); (ii) disclosed that the amended

9   Margin Trigger Level was set at a loan-to-value ratio of 40%; and (iii) reclassified the $740 million of

10  debt under the Margin Loan and Exchangeable Notes as recourse debt, thereby admitting the falsity of

11  its prior classification of the debt as non-recourse.

12      124.    On November 17, 2015, TERP's stock closed at $10.32 per share, apparently breaching

13  the Market Value Trigger under the Margin Loan. The same day, the Margin Loan was secretly

14  amended to waive the trigger for a specified period of time. In connection with the amendment, SUNE

15  paid the loan down by $307 million. SUNE paid an additional $21 million in fees on the transaction.

16  The amendment was not publicly disclosed until November 23, 2015.

17      125.    On November 19, 2015, the Margin Loan was amended again to reset the trigger and

18  provide that, if TERP's stock price reached it again, SUNE would be subject to mandatory prepayment

19  provisions under the loan and/or would be required to post additional cash collateral to bring the loan to

20  value percentage "equal to or less than 0.00%." The amendment was not publicly disclosed until

21  November 24, 2015.

22      126.    On November 20, 2015 – the day after the Margin Loan was amended – SUNE wrested

23  control of GLBL and TERP from its existing management by exercising its right to expand the GLBL

24  and TERP boards and appoint three new directors for GLBL and TERP, who then voted to replace the

25  members of GLBL and TERP's Conflicts Committee, leading to the resignation of other GLBL and

26  TERP directors. GLBL and TERP's board then voted to oust Domenech, Alex Hernandez and other

27  officers and installed Wuebbels as the new CEO. Following these changes, GLBL tentatively agreed to

28  buy 425 MW of solar projects in India from SUNE for $231 million. With the votes of the SUNE-

1  appointed directors, GLBL's board agreed that the company would make an immediate upfront

2  payment of $150 million on the transaction even though material terms of the agreement were still

3  being negotiated and the agreement was subject to cancellation if agreement on the terms could not be

4  reached. The funds were immediately transferred to SUNE, which immediately used $95 million of the

5  proceeds to pay down the Margin Loan. The remaining $81 million was then transferred to SUNE by

6  year end 2015. In this way, GLBL was forced by SUNE to transfer $231 million of its cash to SUNE

7  by year end 2015 in the form of a prepay agreement between the two companies, as SUNE was

8  desperate for cash and because of its financial condition could not access the credit markets.

9      127.  On November 24, 2015, SUNE issued a release announcing that it had repaid all but $5

10  million of the Margin Loan. "'We believe a significant portion of the recent volatility around the

11  Company and its subsidiaries has been attributed to the Margin Loan,'" Chatila said in the release. In

12  Current Reports filed with the SEC on November 23 and 24, 2015, SUNE revealed the amendments to

13  the Margin Loan that had been made on November 17 and 19, 2015.

14      128.  Market analysts quickly realized the transaction for what it was – a desperate attempt by

15  a cash-strapped company to raid its subsidiaries to avoid defaulting on a loan. *See, e.g.,* UBS, *Sun*

16  *Baked*, Nov. 25, 2015 (transaction "points to SUNE's potential cash shortage, given the *immediate* need

17  to pay down the margin loan with upfront cash proceeds, and the lack of liquidity to fund this

18  internally"; "[w]e flag that the cost of capital associated with the term loan and GLBL portfolio sales

19  will be the relative norm for SUNE going forward given the liquidity concerns surrounding SUNE that

20  are permeating the market") (emphasis in original); Deutsche Bank, *Several Overhangs Removed,* Nov.

21  24, 2015 ("SUNE is effectively leveraging its GLBL yieldco to free up cash and deleverage the balance

22  sheet"); JP Morgan, *Loan Paydown and Asset Sales – ALERT*, Nov. 24, 2015 ("[S]ome of the

23  construction risk has now shifted from SUNE to GLBL. GLBL will carry the projects on its balance

24  sheet, but we do not expect the projects to generate CAFD until completion . . . .").

25      129.  As the foregoing events were unfolding, Moody's Investors Service announced on

26  November 23, 2015 that it had downgraded GLBL's credit rating and issued a negative ratings outlook

27  on the company to "reflect the strained liquidity and financial situation at parent Sun Edison" and the

28  "the liquidity stress at and contagion risks from SUNE." Moody's announcement went on to state:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

Although SUNE reported $1.38 billion of cash on hand as of September 30, 2015, we estimate that about $700 million of this cash is at various projects currently under construction and *a majority of this amount is not really free cash available to meet liquidity needs*. Portions of this cash includes EPC profits retained temporarily at the projects by SUNE, which is normally the EPC contractor for all the projects it develops, which we believe is likely available for general liquidity if needed. When we factor in other liquidity demands on SUNE, such as $150-200 million in earnout payments to First Wind, an additional $200 million or so to repay a margin loan to Deutsche Bank, Q4 interest expense of about $50 million and $95 million for the exercise of a put option on the shares of GLBL by the South American company Renova, *there is very little liquidity cushion at SUNE*. This analysis does not yet incorporate whether SUNE's core development operations are a source or use of cash during this quarter.

130.   On December 2, 2015, SUNE issued a release announcing that it was terminating the Renova acquisition.  The same day a leading business publication in India, *Mint*, reported that SUNE Asia Pacific President Pashupathy Gopalan had said the company was walking away from its agreement to acquire Continuum Wind Energy, and two other sources with knowledge told the newspaper that the company would also be terminating a $4 billion joint venture to build a photovoltaic plant in India. According to the *Mint* article, "Gopalan said SunEdison's balance sheet did not provide for enough capital for the 3.5-3.7 GW global capacity addition planned for 2016, which would need upward of $5 billion investment."

131.   On January 7, 2016, SUNE announced a series of complex financing transactions to improve its near-term liquidity crisis, *paying an effective debt cost of more than 20% and diluting shareholder interests by at least 21% to raise funds it needed to repay the 15% Goldman Loan and the Margin Loan and make a required $270 million payout to First Wind*.  SUNE announced it would: (i) borrow $725 million  at LIBOR +10% in a deal that also required it to issue 28.7 million share warrants to the lenders; (ii) exchange $580 million of notes for a $225 million convertible note and 28 million common shares; and (iii) exchange 12 million common shares for $158 million in preferred stock.  "Unfortunately," wrote one *Seeking Alpha* commentator, "the details of today's transactions clearly show SunEdison's desperation."

132.   As SUNE's massive liquidity problems were revealed, insiders came forward to admit that, in fact, SUNE had lacked a reasonable basis for the forecasts for CAFD, DPS and MW growth it had provided to investors in connection with the offerings described herein, and had failed to disclose

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  facts that would have revealed that the forecasts lacked the basis that a reasonable investor would

2  expect. For example:

3          (a)     On February 29, 2016, SUNE announced that it was unable to timely file its 2015

4  Annual Report on Form 10-K due to "ongoing inquiries and investigations by the Audit Committee of

5  the Company's Board of Directors . . . based on allegations made by former executives of the Company

6  concerning the accuracy of the Company's anticipated financial position previously disclosed."

7  Further, "based on certain additional issues raised by a current and former employee" of SUNE, the

8  Audit Committee initiated an additional investigation into SUNE's anticipated financial position. If

9  found to have merit, SUNE "may be required to reassess the Company's liquidity position as well as the

10  disclosures in the Form 10-K, including *whether the Company may require greater liquidity than*

11  *previously anticipated and/or whether the sources are sufficient to meet its requirements*."

12          (b)     On March 16, 2016, SUNE announced a further delay in filing its Form 10-K due

13  to its identification of material weaknesses in internal controls over financial reporting, primarily due to

14  deficient controls over information technology systems used by it and its yieldcos. In a March 29, 2016

15  Report on Form 8-K, GLBL asserted that SUNE had "not performed as obligated under the

16  Management Services Agreement, in particular with respect to financial reporting and control matters."

17          (c)     On March 28, 2016, it was revealed that the SEC was investigating SUNE's

18  disclosures to investors about its liquidity, including its overstatement of cash on hand by including

19  amounts tied up in warehouse and project-level financing that was not accessible by SUNE.

20         133.     Amid the collapse of SUNE's house of cards, additional circumstances were revealed

21  further illustrating that defendants lacked a reasonable basis for their prior statements about SUNE's

22  liquidity and its ability to perform its obligations under the massive amount of debt it was incurring and

23  the numerous projects it committed to developing for GLBL and TERP. For example:

24          (a)     On March 8, 2016, VSLR initiated a lawsuit against SUNE for breach of

25  contract, alleging that SUNE had failed to consummate the VSLR acquisition. After SUNE had

26  initially agreed to the VSLR acquisition in July 2015, SUNE's financial difficulties caused the parties to

27  reduce the merger consideration in December 2015. Notwithstanding this amendment, SUNE's "failure

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1   at almost every turn to satisfy their financing obligations" since the initial merger agreement in July

2   2015 forced VSLR to terminate the transaction agreement and initiate suit against SUNE.

3         (b)     In the March 29, 2016 Report on Form 8-K, GLBL revealed that SUNE had not

4   performed or may be unable to perform under its agreements to contribute projects in Uruguay and

5   India to GLBL's initial project portfolio, as agreed prior to the GLBL IPO. The Report on Form 8-K

6   revealed that "there are currently material amounts of project costs and equity contributions for the

7   Uruguay Projects that remain to be contributed by [SUNE] in order to continue construction of the

8   projects and disbursement of the project finance debt facilities."

9         (c)     In addition, the Report on Form 8-K revealed that the projects in India that GLBL

10  had been forced to purchase in November 2015 to provide SUNE with the cash it needed to retire the

11  Margin Loan were also unlikely to be completed due to SUNE's failure to contribute projects costs and

12  equity contributions, resulting in extended project delays that made it unlikely that the projects would

13  be completed or added to GLBL's portfolio.

**FIRST CAUSE OF ACTION**

**For Violation of §11 of the 1933 Act in Connection with the
SUNE Preferred Offering Against SUNE, Chatila,
Wuebbels, Truong, the SUNE Directors and the SUNE Underwriters**

17  134.   Plaintiffs incorporate all prior allegations of the complaint herein by reference.

18  135.   This cause of action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, for

19  damages in connection with SUNE's August 18, 2015 offering of SUNE Preferred Stock.

20  136.   This cause of action is a strict liability claim and does not sound in fraud. Plaintiffs do

21  not allege that defendants acted with scienter or fraudulent intent as they are not elements of a §11

22  claim.

23  137.   Plaintiffs purchased SUNE Preferred Stock traceable to the SUNE Preferred Offering

24  Materials.

25  138.   This cause of action is brought against defendants SUNE, Chatila, Wuebbels, Truong,

26  the SUNE Directors and the SUNE Underwriters. Each of the following defendants is liable to

27  Plaintiffs as:

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

- SUNE is the registrant and the issuer of the SUNE Preferred Stock for the SUNE Preferred Offering. As the issuer of the SUNE Preferred Stock, SUNE is strictly liable for any material misstatements or omissions in the SUNE Preferred Offering Materials.

- Chatila, Wuebbels and Truong were officers of SUNE at the time of the SUNE Preferred Offering and were responsible for the contents of and signed the SUNE Preferred Offering Materials.

- Each of the SUNE Directors was a director of SUNE at the time of the filing of the SUNE Preferred Offering Materials (except for Proctor and Daley, who were directors only at the time of the filing of the Preferred Offering Prospectus), and each was responsible for the contents of and each (except for Proctor and Daley) signed the SUNE Preferred Offering Materials.

- Each of the SUNE Underwriters served as an underwriter with respect to the SUNE Preferred Stock sold in the SUNE Preferred Offering and was responsible for the contents of the SUNE Preferred Offering Materials.

139.    The SUNE Preferred Offering Materials contained untrue statements of material fact and/or omitted to state other material facts that were necessary to prevent the statements contained therein from being misleading or that were otherwise required to be stated therein, as set forth below.

140.    None of the defendants named in this cause of action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SUNE Preferred Offering Materials that are alleged below were true and did not omit to state material facts that were otherwise required to be stated therein or were necessary to prevent the other statements contained therein from being misleading.

141.    The SUNE Preferred Offering Materials incorporated by reference the quarterly, annual, and current reports SUNE had filed with the SEC prior to the SUNE Preferred Offering, including SUNE's 2Q15 Report on Form 10-Q (filed on August 6, 2015) and its 1Q15 Report on Form 10-Q (filed on May 7, 2015). Both Form 10-Q reports were signed by Wuebbels and included certifications pursuant to the Sarbanes-Oxley Act of 2002 that were signed by Chatila and Wuebbels.

142.    At the time they acquired their shares of SUNE Preferred Stock in the SUNE Preferred Offering, Plaintiffs were without knowledge of the untruths and omissions set forth below.

143. This claim is timely, as it has been asserted within one year after the discovery of the untrue statements and omissions alleged herein, or after such discovery could have been made in the exercise of reasonable diligence, and within three years of the SUNE Preferred Offering.

144. By reason of the conduct herein alleged, each of the defendants named in this cause of action violated §11 of the 1933 Act.

145. As a result of the violations of §11 complained of herein, Plaintiffs have sustained damages in connection with their purchases of SUNE Preferred Stock. Prior to suit, Plaintiffs disposed of their shares of SUNE Preferred Stock at prices that were substantially below the amounts they paid for those securities.

**Untrue Statements of Material Fact in and Other Material Facts Omitted from the SUNE Preferred Offering Materials**

146. The SUNE Preferred Offering Materials contained untrue statements of material fact and/or omitted to state other material facts necessary to make the statements made therein not misleading, relating to SUNE's liquidity and its ability to fund the company's current operations and near-term growth, including that:

    (a)    SUNE had borrowed $169 million from Goldman on August 11, 2015 at a rate of 9.25% and paid a $9 million origination fee (5.3%) to do so;

    (b)    SUNE had breached the debt covenants in the Margin Loan, which required SUNE to post additional cash collateral of at least $159 million to avoid default on the loan, and was at risk of further breaches if the price of TERP common stock did not immediately rebound (collectively, the "Margin Loan Breach"); and

    (c)    SUNE's existing sources of liquidity were insufficient to fund its business operations over the next 12 months or complete the acquisitions it planned for the GLBL start-up portfolio (the "Current Liquidity Shortfall").

147. Disclosure of the 15% Goldman Loan or the Margin Loan Breach would have revealed to investors that SUNE's borrowing strength, financial condition and liquidity had deteriorated and, therefore, that SUNE had an existing liquidity shortfall.

148.    The facts detailed in ¶146, were also required to be disclosed, *inter alia*, because the rules and regulations governing registration statements required the registrants to disclose any material trends in the registrant's liquidity and capital resources.

**A.    Liquidity, Capital Resources and Descriptions of Borrowing Agreements**

149.    SUNE's 2Q15 Report on Form 10-Q, which was incorporated by reference into the SUNE Preferred Offering Materials, purported to describe, at pages 60-66, the company's liquidity and capital resources by describing its existing borrowings (including the Margin Loan) and other sources of capital, and its anticipated uses of that capital and future needs for additional capital. For example, the 2Q15 Report on Form 10-Q stated:

> Our consolidated financial statements have been prepared assuming the realization of assets and the satisfaction of liabilities in the normal course, as well as continued compliance with the financial and other covenants contained in our existing credit facilities and other financing arrangements.
>
> \*       \*       \*
>
> We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.
>
> In addition to our need to maintain sufficient liquidity from cash flow from our operations and borrowing capacity under our credit facilities, we will need to raise additional funds in the future in order to meet the operating and capital needs of our renewable energy system development business, including the acquisition and construction of renewable energy systems that we intend to retain on our balance sheet, including those systems that we intend to contribute to TerraForm Power and TerraForm Global. These funds are expected to be in the form of non-recourse project finance capital. However, there can be no assurances that such project financing or equity will be available to us, or available at terms and conditions we find acceptable. We may not be able to sell renewable energy projects or secure adequate debt financing or equity funding for such projects on favorable terms, or at all, at the time when we need such funding.
>
> In the event that we are unable to raise additional funds, our liquidity will be adversely impacted, we may not be able to maintain compliance with our existing debt covenants and our business will suffer. If we are able to secure additional financing, these funds could be costly to secure and maintain and could significantly impact our earnings and our liquidity.
>
> We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

150.    The statements made in ¶149 above contained untrue statements of material fact and/or omitted to state other material facts necessary to make the statements made therein not misleading, including the 15% Goldman Loan, the Margin Loan Breach and the Current Liquidity Shortfall, as well as:

(a)    purporting to warn investors that SUNE's liquidity and financial position "could be" harmed if SUNE had to raise additional funds or could not obtain financing on favorable terms, while failing to disclose that – prior to the SUNE Preferred Offering – SUNE had borrowed $169 million from Goldman at an effective interest rate of 15% to generate badly needed operating cash and complete the acquisition of projects for GLBL's start-up portfolio; and

(b)    stating that SUNE's financial statements had been prepared "assuming ... continued compliance with the financial and other covenants in our existing credit facilities and other financing arrangements," and that based on those financial statements, SUNE and the SUNE Directors believed that "our liquidity will be sufficient to support our operations for the next twelve months," without disclosing that – as of August 18, 2015 (date of the SUNE Preferred Offering) – SUNE had breached the covenants on the Margin Loan (and would need to post $159 million in additional cash collateral on the loan) or that TERP's stock price was dangerously close to the level that would trigger a breach of the Margin Loan debt covenants.

151.    Plaintiffs and other investors would not have purchased the SUNE Preferred Stock had they known that SUNE had recently borrowed funds at an effective rate of 15% from one of the underwriters.

152.    The 2Q15 Report on Form 10-Q also provided a false and misleading description of the Margin Loan's debt covenants:

> The Margin Loan Agreement requires the subsidiary to maintain a loan to value ratio not to exceed 50% (based on the value of the Class A common stock of TerraForm ("TerraForm Class A Common Stock"), which certain of the collateral may be exchanged for). In the event that this ratio is not maintained, the subsidiary must post additional cash collateral under the Margin Loan Agreement and/or elect to repay a portion of the term loans thereunder. In addition, the Margin Loan Agreement requires the repayment of all or a portion of the term loans made thereunder upon the occurrence of certain events customary for financings of this nature, including other events relating to the price, liquidity or value of TerraForm Class A Common Stock, certain events or extraordinary transactions related to TerraForm and certain events related to SunEdison.

The Borrower's obligations under the Margin Loan Agreement are secured by a first priority lien on shares of Class B common stock in TerraForm, and Class B units and incentive distribution rights in Terra LLC, in each case, that are owned by the subsidiary. The Margin Loan Agreement contains customary representations and warranties, covenants and events of default for financings of this nature. Upon the occurrence and during the continuance of an event of default, any lender may declare the term loans due and payable, exercise remedies with respect to the collateral and demand payment from SunEdison of the obligations under the Margin Loan Agreement then due and payable. TerraForm has agreed to certain obligations in connection with the Margin Loan Agreement relating to its equity securities.

153.    The foregoing statements contained untrue statements of material fact and/or omitted to disclose the Margin Loan Breach, and in the absence of that disclosure, it was false and/or misleading to:

(a)    describe the triggers for debt covenant violations under the loan without disclosing that the triggers had been, or were about to be, breached;

(b)    warn of the consequences that *could* result from a breach of the debt covenants without disclosing that SUNE was already liable for posting an additional $159 million in cash collateral on the loan; and

(c)    fail to warn that the failure of TERP's stock price to improve from current levels or that a further decline in its value would trigger a further breach of those covenants.

154.    The Preferred Offering Prospectus also included a description of lending agreements between SUNE and the SUNE Underwriters, which stated:

Certain of the underwriters and their respective affiliates have provided, from time to time in the past, and may in the future provide, investment banking, financial and other services to us. They receive customary fees and commissions for these services. The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage, tax equity financing and other financial and nonfinancial activities and services. Certain of the underwriters and their affiliates have provided, and may in the future provide, a variety of these services to us and to persons and entities with relationships with us, for which they received or will receive customary fees and expenses.

In addition, certain of the underwriters or their respective affiliates are parties to the bridge financing commitments entered into in connection with the First Wind Acquisition and lenders under the $410 million margin loan secured by a portion of our equity stake in TerraForm that we incurred on January 29, 2015. Also, certain of the underwriters or their respective affiliates are parties to the senior secured letter of credit facility with us in an aggregate principal amount up to $750 million as of July 31, 2015. We have also entered into a commitment letter with Goldman Sachs Bank USA for a $500 million secured term loan facility, and TerraForm Operating has entered into a

debt commitment letter with Goldman Sachs Bank USA for a $960 million unsecured bridge facility pursuant to which certain of the underwriters or their affiliates will be lenders. The funding of the term facility and bridge facility is subject to the negotiation of definitive documentation and other customary closing conditions. We have also entered into a $150 million four-year term loan with Deutsche Bank in connection with our joint venture with Dominion for Four Brothers. In addition, certain investment funds managed by Goldman, Sachs & Co. (collectively, the "GS Funds") have entered into agreements with us to form a new warehouse for the construction and acquisition of utility-scale solar and wind projects (the "Warehouse"). Subject to certain conditions, the GS Funds have agreed to contribute up to $300 million of equity to the Warehouse, and a syndicate of banks, including certain of the underwriters or their respective affiliates, have agreed to provide debt financing to the Warehouse of up to $700 million in senior secured credit facilities.

155.    The foregoing statements were materially false and misleading as they purported on their face to be a complete disclosure of the borrowing agreements between SUNE and its underwriters, yet omitted to disclose the 15% Goldman Loan and that SUNE was liable to certain of the SUNE Underwriters, including Goldman and Deutsche Bank, to post additional cash collateral on the Margin Loan because the value of the TERP equity stake described therein had insufficient value to maintain compliance with the applicable debt covenants.

**B.    Results of Operations and Recent Developments**

156.    The SUNE Preferred Offering Materials, including SUNE's 2Q15 Report on Form 10-Q incorporated therein, violated, *inter alia*, the rules and regulations governing registration statements, because the discussions and analysis of SUNE's financial condition, results of operations and recent developments all failed to disclose the 15% Goldman Loan, the Margin Loan Breach, and the Current Liquidity Shortfall, each of which represented, both individually and cumulatively, material trends in SUNE's liquidity and capital resources.

157.    The Preferred Offering Prospectus's discussion of Recent Developments at pages S-2 to S-6 was also false and misleading as it described: (i) SUNE's warehouse financing facility; (ii) joint venture agreement with Dominion Resources; (iii) the GLBL IPO; and (iv) the merger and acquisition agreements with VSLR, Renova and Invenergy – while omitting to disclose the 15% Goldman Loan, the Margin Loan Breach or the Current Liquidity Shortfall.

158.    SUNE's 2Q15 Report on Form 10-Q, which was incorporated by reference into the Preferred Offering Prospectus, discussed Recent Developments of SUNE while omitting to disclose the

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    15% Goldman Loan, the Margin Loan Breach or the Current Liquidity Shortfall, and was therefore

2    materially false and misleading for the same reason.

3        159.    SUNE's 2Q15 Report on Form 10-Q also provided at page 52 the following overview of

4    the company's business:

> During the second quarter of 2015, we continued execution of a strategic plan
> for the ongoing operation of our businesses. Our business strategy is designed to address
> the most significant opportunities and risks which we currently face, including:
>
> • Building our renewable energy project pipeline in order to fuel future global
>   growth in our development business across all platforms.
>
> • Growing our portfolio of owned renewable power generation assets within
>   TerraForm and other future vehicles in order to generate cash available for
>   distribution, a portion of which will subsequently be distributed to common
>   shareholders of TerraForm, as well as, in the future, preferential sponsor
>   only incentive distributions rights to SunEdison.
>
> • Managing working capital in consideration of our growth initiatives as well
>   as our desire to retain the majority of the renewable energy projects we
>   develop on our balance sheet (through TerraForm or other future vehicles).

        160.    The foregoing statements in ¶¶158-159 were materially false and misleading because, in

failing to disclose the 15% Goldman Loan, the Margin Loan Breach or the Current Liquidity Shortfall,

the 2Q15 Report on Form 10-Q omitted "significant . . . risks which we currently face," including:

        (a)    that SUNE lacked adequate liquidity to build its "renewable energy project

pipeline in order to fuel future global growth";

        (b)    significant current events such as the 15% Goldman Loan and the Current

Liquidity Shortfall that severely undermined SUNE's business strategy to "[g]row[] our portfolio of

owned renewable power generation assets" within GLBL and TERP to generate sufficient CAFD

growth to make required DPS payments and meet milestones that would permit the payment of IDRs to

SUNE; and

        (c)    a material weakness in SUNE's ability to manage its working capital in a manner

that would permit it to meet its growth initiatives and retain the majority of its renewable energy

projects on its balance sheet.

- 42 -

**C.     Use of Proceeds**

161.     The Preferred Offering Prospectus stated the following under the heading "Use of Proceeds":

> We estimate that the proceeds from this offering, after deducting the underwriters' discounts and commissions and estimated offering expenses payable by us, will total approximately $626.1 million.

> We expect to use the net proceeds of this offering for general corporate purposes, which we expect to include funding working capital and growth initiatives. At this time, we have not specifically identified a large single use for which we intend to use the net proceeds, and, accordingly, we are not able to allocate the net proceeds among any potential uses in light of the variety of factors that will impact how such net proceeds will ultimately be utilized by us. As a result, our management will retain broad discretion over the use of the net proceeds from this offering.

> Pending use of the proceeds from this offering, we intend to invest the proceeds in short-term, investment-grade and interest-bearing instruments or money market funds.

162.     The foregoing statements in ¶161 were materially false and misleading because the true purpose of the SUNE Preferred Offering was to address the ***current*** liquidity shortfall that had manifested in a liquidity crisis at SUNE.  Together with the other representations made in connection with the SUNE Preferred Offering as described in ¶¶149-160 above, the foregoing language created the misleading impression that SUNE was raising capital to preserve its flexibility to take advantage of future opportunities as they arose, and not to meet existing liabilities and immediate needs, which was the true purpose of the SUNE Preferred Offering.

## SECOND CAUSE OF ACTION

**For Violation of §12(a)(2) of the 1933 Act in Connection
with the SUNE Preferred Offering Against SUNE, Chatila,
Wuebbels, Alex Hernandez, the SUNE Directors and the SUNE Underwriters**

163.     Plaintiffs incorporate all prior allegations of the complaint herein by reference.

164.     This cause of action is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §771(a)(2), for damages against defendants SUNE, Chatila, Wuebbels, Alex Hernandez, the SUNE Directors and the SUNE Underwriters.

165.     This cause of action does not sound in fraud.  Plaintiffs do not allege that defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

166.    The defendants named in this cause of action offered to sell, promoted and/or sold SUNE Preferred Stock to the Plaintiffs by means of the Preferred Offering Prospectus and oral communications that included untrue statements of material fact and omitted to state other material facts necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, as alleged below and in ¶¶146-162 above.

167.    The defendants named in this cause of action were statutory sellers who solicited the sale of and/or sold the SUNE Preferred Stock by means of the Preferred Offering Prospectus and oral communications, and they did so for the benefit of SUNE and/or for their own personal gain.

168.    Plaintiffs purchased SUNE Preferred Stock in the SUNE Preferred Offering pursuant to the Preferred Offering Prospectus.  Plaintiffs purchased SUNE Preferred Stock from Goldman.

169.    On August 17, 2015, Plaintiffs confirmed that they would participate in the SUNE Preferred Offering.

170.    None of the defendants named in this cause of action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Preferred Offering Prospectus and the oral communications detailed herein, were true and did not omit to state material facts necessary to be stated in order to make the statements made therein not false or misleading. The defendants named herein, in the exercise of reasonable care, should have known of the misstatements and omissions as set forth above.

171.    At the time they acquired their shares of SUNE Preferred Stock, Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions alleged in this cause of action.

172.    This cause of action is timely, as it has been asserted within one year after the discovery of the untrue statements and omissions alleged herein, or after such discovery could have been made in the exercise of reasonable diligence, and within three years of the SUNE Preferred Offering.

173.    By reason of the conduct alleged herein, the defendants named in this cause of action violated §12(a)(2) of the 1933 Act.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

174. Plaintiffs sustained damages in connection with their purchases of SUNE Preferred Stock as a direct and proximate result of defendants' violations of §12(a)(2) of the 1933 Act. Plaintiffs seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

**For Violation of §15 of the 1933 Act in Connection with the SUNE Preferred Offering Against Chatila, Wuebbels and Truong**

175. Plaintiffs incorporate all prior allegations of the complaint herein by reference.

176. This cause of action is brought pursuant to §15 of the 1933 Act against defendants Chatila, Wuebbels and Truong.

177. Chatila, Wuebbels and Truong controlled SUNE by virtue of their senior positions with the company and their power to set, influence and enforce the financial, operating and disclosure policies and procedures of the business, including, as detailed in ¶¶13, 14, 16, 138 above.

178. Chatila, Wuebbels and Truong each had additional control over SUNE as a result of their direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of SUNE.

179. Defendants each were participants in the violations of §§11 and/or 12(a)(2) of the 1933 Act as alleged above, based on their having signed or authorized the signing of the SUNE Preferred Offering Materials and having otherwise actively participated in the sales process, including the preparation of the selling documents and/or road show presentations which allowed the SUNE Preferred Offering to be successfully completed.

### FOURTH CAUSE OF ACTION

**For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection with the Conversion of GLBL Class D Securities to GLBL Common Stock Against GLBL, SUNE, Chatila and Wuebbels**

180. Plaintiffs incorporate all prior allegations of the complaint herein by reference.

181. This cause of action is brought pursuant to Md. Code §11-703 by Omega against GLBL, SUNE, Chatila and Wuebbels.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

182.     This claim arises from the forced sale and conversion of Plaintiffs' GLBL Class D Securities into shares of restricted GLBL common stock at the time of, and in connection with, GLBL's IPO.  GLBL's IPO was completed by means of the IPO Offering Materials, which contained untrue statements of material fact and/or omitted to state material facts as required to be stated therein or were necessary to make the statements made therein not false or misleading, as alleged below.

183.     The GLBL IPO Offering Materials claim on their face that they were signed in and issued from Bethesda, Maryland.  Defendants named in this cause of action were therefore subject to, and required to comply with, the requirements of the Maryland Securities Act, Md. Code §11-101, *et. seq.*, in connection with the offerings described therein.

184.     On or about July 31, 2015, by means of the false and misleading IPO Offering Materials, GLBL forced Omega to sell its GLBL Class D Securities to GLBL and to use the proceeds to immediately purchase restricted shares of GLBL common stock, effecting a forced conversion of its GLBL Class D Securities to restricted common stock.

185.     The GLBL Class D Securities converted by defendants to GLBL common stock were initially purchased on June 9, 2015 by Omega from GLBL.  Omega's purchase was materially aided by JP Morgan, which acted on behalf of and as an agent for GLBL.

186.     The IPO Offering Materials contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made in those documents, in the light of the circumstances under which they were made, not misleading, as set forth above.  But for the misrepresentations contained therein, GLBL would not have been able to complete the IPO, and therefore would not have been able to force the conversion of Omega's Class D Securities to restricted common stock.

187.     SUNE directly and indirectly controlled GLBL at the time the Class D Securities were purchased from, and the restricted common stock was sold to, Omega.

188.     Chatila and Wuebbels were officers or directors of SUNE and GLBL at the time the Class D Securities were purchased from, and the restricted common stock was sold to, Omega.

189.     GLBL, SUNE, Chatila and Wuebbels knew about, or in the exercise of reasonable care could have known about, the misrepresentations and omissions in the GLBL Class D Registration

- 46 -

1   Statement and the IPO Offering Materials at the time they were filed with the SEC and at the time the

2   GLBL Class D Securities were purchased from, and the restricted GLBL common stock sold to Omega.

3        190.    Omega did not know, and could not in the exercise of reasonable diligence have known,

4   of the misrepresentations and omissions in the IPO Offering Materials at the time of the July 31, 2015

5   conversion.

6        191.    Omega has suffered damage as a result of the forced conversion of its Class D Securities

7   by means of the IPO Offering Materials.

8        192.    GLBL is civilly liable to Omega pursuant to Md. Code §11-703(a).  SUNE, Chatila and

9   Wuebbels are civilly liable to Omega pursuant to Md. Code §11-703(c)(1).  All defendants named in

10  this cause of action are jointly and severally liable pursuant to Md. Code §11-703(c).

11  **Untrue Statements of Material Fact in and Other Material
    Facts Omitted from the IPO Offering Materials**

12

13       **A.    SUNE's Inability to Finance GLBL's High Growth Strategy**

14       193.    The IPO Registration Statement emphasized the strength of GLBL and its relationship

15  with SUNE.  GLBL described itself as a "high-growth" company that could reasonably be expected to

16  grow its MWs under management and achieve a 20% CAGR through the continuous acquisition of

17  projects developed by SUNE for its portfolio.  The Overview of the business provided in the IPO

18  Registration Statement began as follows:

19           We are a high-growth, globally diversified renewable energy company that owns
         long-term contracted wind, solar and hydro-electric power plants.  Our business
20       objective is to increase our dividend to stockholders by continuing to acquire, from
         SunEdison and unaffiliated third parties, clean power generation assets that produce
21       high-quality, long-term contracted cash flows, primarily by serving utility and
         commercial customers with strong credit profiles.

22  IPO Registration Statement at 1, 142, 189.

23       194.    The IPO Registration Statement asserted that GLBL would "rapidly expand" its project

24  portfolio by exercising its ROFO rights to acquire and operate the projects on the call list from SUNE:

25       *Call and ROFO rights*

26           We believe we will be able to rapidly expand our initial portfolio as a result of
         the significant project acquisition call rights and rights of first offer, or "ROFO rights,"
27       that we have with our Sponsor and the project acquisition call rights and ROFO rights
         we have and expect to acquire from third-party developers of clean power generation

28

- 47 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

assets. Upon completion of this offering, we will have call rights with respect to identified projects that have an aggregate capacity of 5,856.1 MW.

We will enter into a support agreement with our Sponsor immediately prior to the completion of this offering, pursuant to which our Sponsor will agree to offer us additional qualifying projects through the fifth anniversary of the completion of this offering that are projected to generate an aggregate of at least $1.4 billion of cash available for distribution during their respective first twelve months of commercial operations. We expect that our Sponsor will continue to provide us with the opportunity to acquire additional qualifying projects after it has satisfied its minimum commitment under the support agreement in order to maximize the value of its equity ownership and incentive distribution rights. The support agreement with our Sponsor will also grant us ROFO rights with respect to additional clean energy projects that our Sponsor elects to sell or otherwise transfer and that are located in our initial target markets or other emerging markets that we mutually agreed upon.

IPO Registration Statement at 2, 189; *see also id.* at 14, 193 ("[W]e will be able to rapidly expand our initial portfolio through several channels. We have significant project acquisition call rights and ROFO rights with our Sponsor."); *id.* at 69 ("We intend to rapidly expand and diversify our initial portfolio by acquiring additional utility-scale and distributed clean generation assets . . . ."); *id.* at 142, 195 ("We intend to rapidly expand and diversify our initial portfolio . . . .").

195.    The IPO Offering Materials also represented that SUNE's financial strength, liquidity, access to capital markets, and project acquisition and financing experience were what would allow GLBL to attain these targets and meet its high-growth business objectives. For example, the IPO Registration Statement at page 2 emphasized SUNE's financial strength and track record, stating:

We believe we are well positioned to capitalize on favorable market trends in the renewable power generation segment due to our relationship with our Sponsor, which has an established presence in each of our initial target markets, a strong asset development pipeline and acquisition track record, significant project financing experience and asset management and operational expertise.

196.    The IPO Registration Statement repeatedly emphasized the strength of SUNE's business, GLBL's relationship with SUNE and the resultant benefits that relationship would have for GLBL, including GLBL's "access to the significant resources of our Sponsor to support the high-growth strategy of our business." The IPO Registration Statement further stated:

*Relationship with SunEdison.* We believe our relationship with our Sponsor provides us with significant benefits, including the following:

- *Strong asset development track record.* Our Sponsor has demonstrated a significant track record in developing both solar and, as a result of its acquisition of First Wind, wind energy generation facilities. Over the last three calendar

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

years, our Sponsor has constructed solar power generation assets with an aggregate capacity of 2.0 GW and, as of March 31, 2015, was constructing additional solar power generation assets expected to have an aggregate capacity of approximately 773.7 MW. Our Sponsor has been one of the top three developers and installers of solar energy facilities in the world in each of the past two years based on megawatts installed. Our Sponsor has developed over 1,300 solar and wind projects and has completed all of the projects on which it has commenced construction, including over 140 projects in our initial target markets. In addition, our Sponsor had a 7.5 GW pipeline of development stage solar and wind projects as of March 31, 2015, including 1.7 GW in our initial and future target markets. As of the same date, our Sponsor employed 3,400 people globally, of which over 1,900 were serving as developers and operators of renewable energy projects. Our Sponsor's operating history demonstrates its organic project development capabilities in our initial target markets. We believe our Sponsor's relationships, knowledge and employees will facilitate our ability to rapidly acquire operating projects from our Sponsor in our initial target markets.

- *Yieldco experience.* Our Sponsor's subsidiary, TerraForm Power, which owns and operates clean power assets located in the United States and other select jurisdictions, completed its initial public offering in July 2014. With our Sponsor's support, TerraForm Power has raised approximately $3.9 billion in acquisition and permanent financing to pursue acquisitions of renewable energy projects totaling 1,703.0 MW as of May 1, 2015.

- *Proven acquisition expertise.* In 2014, our Sponsor completed 32 corporate and project acquisitions worldwide, which included operating projects with an aggregate nameplate capacity of 1.5 GW. In addition, our Sponsor, through TerraForm Power, completed the acquisition on January 29, 2015 of First Wind's 500.0 MW of operating wind generation assets and 21.1 MW of operating solar generation assets and 1.66 GW of wind and solar generation assets under development. These acquisitions include two wholly owned subsidiaries of Honiton, which provides our Sponsor with an operating and maintenance platform in China. Additionally, our Sponsor's pending acquisition of LAP will provide it with a hydro-electric development pipeline in Peru and an operations and maintenance platform in Latin America. We believe our Sponsor's significant acquisition experience and expertise will enable us to expand our portfolio through additional acquisitions of operating projects from unaffiliated third parties in our initial target markets. Our initial portfolio includes two projects that we have acquired from third parties. Concurrently with this offering or, in certain cases, during the remainder of 2015, we expect to complete seven separate transactions to acquire projects included in our initial portfolio, expanding our geographic footprint and diversifying our renewable energy technologies.

- *Project financing experience.* We believe our Sponsor has demonstrated a successful track record of sourcing long-term capital to fund project acquisitions and the development and construction of projects located in our initial target

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

markets. To date, our Sponsor has raised an aggregate of $3.3 billion since January 1, 2014 to support its development and acquisition activities. We expect that we will realize significant benefits from our Sponsor's financing and structuring expertise as well as its relationships with financial institutions and other providers of capital.

- *Asset management expertise.* We will have access to the significant resources of our Sponsor to support the high-growth strategy of our business. As of March 31, 2015, our Sponsor had over 4.9 GW of projects under management across 20 countries. Approximately 16.1% of these projects are third-party power generation facilities, demonstrating our Sponsor's collaboration with multiple developers and owners. These projects utilize 29 different module types and inverters from 17 different manufacturers. As of March 31, 2015, our Sponsor had approximately 700 employees servicing operations and management in our initial target markets. In addition, our Sponsor maintains three renewable energy operation centers to service assets under management. Our Sponsor's asset management experience helps ensure that our facilities will be monitored and maintained to maximize cash generation. We also benefit from First Wind's asset management expertise as the First Wind team has been integrated with our Sponsor.

IPO Registration Statement at 15-16, 193-94.

197. The statements made in ¶¶193-196, contained untrue statements of material fact and/or omitted to state other material facts necessary to make the statements made therein not misleading, including that:

(a) GLBL was not positioned to benefit from SUNE's "significant resources" in light of the undisclosed fact that SUNE had insufficient liquidity to support the "high-growth strategy" or permit the "rapid[] expan[sion]" of the business via the call rights list;

(b) SUNE lacked sufficient liquidity and access to capital to acquire or develop the projects in the manner or within the timeframes represented;

(c) the foregoing statements concerning SUNE's liquidity and capital markets expertise were misleading, as they omitted to disclose that: (i) SUNE had structured the 15% Goldman Loan to acquire projects for GLBL's start-up portfolio and/or cure an actual or anticipated debt covenant breach, (ii) SUNE was then in breach of the debt covenants under the Margin Loan, or such a breach was imminent, and (iii) the vast majority of the liquidity that SUNE had was unavailable to be used for working capital, leaving it with insufficient cash to meet the day-to-day needs of its business;

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    (d)    as a result of (a)-(c) above, and in light of SUNE's other existing financial

2  obligations and commitments as alleged herein, there was no reasonable basis to believe that SUNE

3  would have sufficient liquidity to acquire, develop and construct the projects on GLBL's call rights list

4  that needed to be dropped down in order to permit GLBL to realize its forecast MW growth, or to do so

5  at a cost that would permit GLBL to meet its CAFD or DPS growth forecasts;

6    (e)    GLBL was not positioned to benefit from its relationship with SUNE in the

7  manner represented, as SUNE lacked the ability to acquire the LAP, Renova, Continuum and other

8  projects on GLBL's call rights list or to carry out its obligations under the Support Agreement to offer

9  or provide GLBL, within five years of the IPO, projects that would generate an aggregate of $1.4 billion

10  in CAFD during their first year of operation;

11    (f)    SUNE lacked the liquidity and financial strength to permit GLBL to have a

12  reasonable expectation of meeting the stated growth targets of 20% CAGR in dividends for its business;

13    (g)    as a result of (a)-(f) above, the defendants named in this cause of action were

14  aware of facts that conflicted with what a reasonable investor would take from defendants' statements

15  in ¶¶193-196 above, and had no reasonable basis for GLBL's MW, CAFD or dividend growth forecasts

16  or the representations about SUNE's financial strength or GLBL's ability to benefit from its relationship

17  with SUNE, given SUNE's lack of liquidity at the time of the IPO; and

18    (h)    as a result of (a)-(f) above, the foregoing statements were at best misleading

19  "half-truths" that failed to disclose or understated the risks and overstated GLBL's ability to rapidly

20  expand its business in a manner that would permit it to realize the high growth objectives described in

21  the IPO Offering Materials.

22    198.    The GLBL IPO Offering Materials were also materially false and misleading as

23  described below because they omitted, in violation of the rules and regulations governing registration

24  statements, to disclose material trends in SUNE's liquidity and capital resources and, therefore, the

25  liquidity and capital resources that would be available to GLBL.

26    199.    The IPO Registration Statement, at page 193, stated that GLBL's financial practices

27  (which were wholly dependent upon and operated by SUNE under the Management Services

28  Agreement) included "*financing policy focused on achieving an optimal capital structure through*

- 51 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1 *various capital formation alternatives to minimize interest rates, refinancing risks and tax*

2 *withholdings*." This statement was materially false and misleading in that it failed to disclose that

3 SUNE had already violated that policy by structuring an agreement to borrow funds from Goldman at

4 an exorbitant interest rate (the 15% Goldman Loan) and had breached or was about to breach another

5 agreement (the Margin Loan) in a manner that gave rise to a significant risk that the agreement would

6 have to be (and ultimately was) refinanced.

7 **B.    Misleading Risk Warnings**

8       200.    The IPO Offering Materials also misled investors by warning of conditions that might

9 harm GLBL's business *if* they arose in the future, when, in fact, those conditions had already

10 manifested, resulting in current conditions then impacting GLBL at the time of the IPO, as opposed to

11 the contingent future risks that the IPO Offering Materials represented.

12      201.    For example, the IPO Registration Statement stated:

13          Any significant disruption in the credit or capital markets, or a significant increase in
            interest rates, could make it difficult for our Sponsor or other development companies to
14          successfully develop attractive projects and may also limit their ability to obtain project-
            level financing to complete the construction of projects we may seek to acquire. It
15          could also adversely affect our ability to fund acquisitions and/or operating costs. If our
            Sponsor or other development companies from which we seek to acquire projects are
16          unable to raise funds when needed, or if we or they are unable to secure adequate
            financing, the ability to grow our project portfolio may be limited, which could have a
17          material adverse effect on our ability to implement our growth strategy and, ultimately,
            our business, financial condition, results of operations and cash flows.
18
19 IPO Registration Statement at 54-55.

20      202.    The foregoing "risk disclosure" in the IPO Registration Statement was materially false

21 and misleading. The true facts were that SUNE's borrowing costs had already increased dramatically,

22 as evidenced by the undisclosed 15% Goldman Loan SUNE had structured. Thus, at the time of the

23 IPO, SUNE already lacked the ability to successfully develop projects with project-level financing that

24 permitted it to complete the construction of such projects on terms and at a cost that would permit

25 SUNE to implement its growth strategy without adversely affecting its business, financial conditions,

26 results of operations and cash flows. Likewise, the failure to disclose the actual or imminent breach of

27 the Margin Loan confirms that the risks described in the IPO Registration Statement as contingent

28 future events had in fact already manifested as of July 31, 2015.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

203.    In the IPO Registration Statement, defendants "forecast that our cash available for distribution during the twelve months ending June 30, 2016 and December 31, 2016 will be approximately $195.8 million and $231.5 million, respectively, of which we forecast $110.3 will be distributed" as dividends, and that this would be sufficient to pay SUNE's annual dividend of $1.10. The IPO Registration Statement further asserted that: (i) GLBL "ha[d] a reasonable basis for these assumptions and that our actual results of operations will approximate those reflected in our forecast"; (ii) "for purposes of our forecast, we have assumed that no unexpected risks will materialize during the forecast periods"; and (iii) based on GLBL's ability to expand its project portfolio through the projects on the SUNE call rights list, GLBL could reasonably be expected to achieve a 20% CAGR in the dividends paid to investors over the first three years of its life.  The IPO Registration Statement also stated:

> We intend to target a 20% CAGR in dividends per share over the three-year period following the completion of this offering. This target is based on, and supported by, our Sponsor's $1.4 billion aggregate Projected FTM CAFD commitment to us under the Support Agreement and our Sponsor's track record of successful project acquisitions from unaffiliated third parties, which will provide us the opportunity to grow our CAFD following this offering. While we believe our targeted growth rate is reasonable for the emerging markets on which we focus, it is based on estimates and assumptions regarding a number of factors, many of which are beyond our control, including the market value of projects we acquire from third parties, the purchase price we pay for acquired projects, our cost of capital, the ratio of debt to equity with respect to the financing of acquisitions, whether we have the financial resources to acquire the Call Right Projects and the timing of such acquisitions. Prospective investors should read "Cash dividend policy," including our financial forecast and related assumptions, and "Risk factors," including the risks and uncertainties related to our forecasted results, completion of construction of projects and acquisition opportunities, in their entirety.

IPO Registration Statement at 5.

204.    The foregoing statements were materially misleading because there was no reasonable basis for the assumption that the projects on GLBL's call rights list could be acquired on terms that would support forecast CAFD or DPS growth, or at all in light of SUNE's deteriorating liquidity condition.  Neither was it reasonable to prepare forecasts based on an expectation that no unexpected risks would materialize.  By the time of the IPO, undisclosed conditions had already materialized that threatened the ability to acquire or complete the projects on GLBL's call rights list or achieve its long-term growth forecasts.  SUNE had also already structured the 15% Goldman Loan to acquire projects for its start-up list, the debt covenants on the Margin Loan were dangerously close to the level that

1    would cause them to be breached (or a breach had already occurred), and SUNE lacked the liquidity to

2    acquire and develop some of the projects on GLBL's call rights list, including projects from LAP,

3    Continuum, Globeleq and Renova.

4         205.    The IPO Registration Statement at pages 7-10 included descriptions of GLBL's initial

5    project portfolio and the projects on its call rights list with SUNE, stating that by the end of 2015,

6    GLBL's initial project portfolio would consist of 1,406 MW of capacity.  The IPO Registration

7    Statement also included at page 8 a "risk disclosure" noting that some of those acquisitions could be

8    delayed if the transactions did not receive government approval or if construction was not completed so

9    that the plants were placed into commercial operation by the end of the year, stating:

> With the exception of five projects representing an aggregate of 128.2 MW, all
> of the Sponsor contributed projects included in our initial portfolio have reached their
> COD. We expect the remaining five projects to reach COD before the end of 2015. Our
> initial portfolio includes the Pending Acquisitions representing 921.7 MW that we
> expect to close concurrently with the completion of this offering or during the remainder
> of 2015. The Pending Acquisitions include three non-operational projects representing
> an aggregate of 158.4 MW. Our acquisition of these projects is subject to their reaching
> COD, which we expect to occur before the end of 2015. However, we cannot assure you
> that all of the projects in the Pending Acquisitions that are to be acquired upon reaching
> COD will achieve COD on the currently anticipated timelines or at all, or that any of the
> Pending Acquisitions that are expected to close after the consummation of this offering
> will close on the currently anticipated timelines or at all. Because the forecasted CAFD
> presented in this prospectus is based upon assumptions regarding the size of our
> portfolio and the timing of the consummation of the Pending Acquisitions (which, in
> certain cases, depends upon the timing of projects under construction reaching COD),
> our actual CAFD for the forecast periods could be smaller than the forecasted CAFD.
> See "Risk factors – Risks related to our business – There can be no assurance that the
> Pending Acquisitions will be consummated on the timetable currently anticipated, and
> the closing of this offering is not conditioned on the consummation of these
> acquisitions" and "– Our forecasted and unaudited pro forma financial information
> assumes the completion of all of the Pending Acquisitions." To reduce the effect on the
> Class A units of delays (if any) in the closing of the Pending Acquisitions or the
> completion of the Contributed Construction Projects, our Sponsor has agreed to forego
> distributions on its Class B units under certain circumstances. See "– The offering –
> Distribution Forbearance Provisions."

23        206.    The foregoing "risk disclosure" omitted material facts necessary to make the statements

24   made therein not misleading, including that at the time of the GLBL IPO, SUNE lacked sufficient

25   liquidity to actually acquire the projects for GLBL's call rights list needed to support the forecast

26   growth, such as the LAP, Renova and Continuum acquisitions.   SUNE's cancellation of these

27   acquisitions, which included projects for GLBL's start-up project portfolio and call rights list, further

28   confirms that SUNE lacked the liquidity to fund the commencement of GLBL's operations.  The

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

foregoing statement also was materially false and misleading in that it indicated that the principal risks to GLBL's start up were external delays (*i.e.*, in permitting, construction or government approvals), whereas the real (and undisclosed) "risk" was that neither GLBL nor SUNE had lined up or had access to the financing necessary to acquire those projects in the timeframes represented.

### FIFTH CAUSE OF ACTION

**For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection with the Purchase of GLBL Class D Securities Against GLBL, SUNE, Chatila, Wuebbels and the GLBL Placement Agents**

207.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

208.    This cause of action is brought pursuant to Md. Code §11-703 against GLBL, SUNE, Chatila, Wuebbels and the GLBL Placement Agents.

209.    The GLBL Class D Registration Statement claims on its face that it was signed in and issued from Bethesda, Maryland. Defendants named in this cause of action were therefore subject to, and required to comply with, the requirements of the Maryland Securities Act, Md. Code §11-101, *et. seq.*

210.    On or about June 9, 2015, defendants named in this cause of action offered and sold GLBL Class D Securities to Plaintiffs by means of the GLBL Class D Registration Statement, which contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, as set forth in ¶¶193-206 below.

211.    SUNE directly or indirectly controlled GLBL at the time of the sale of the GLBL Class D Securities to Plaintiffs by virtue of its status as the sponsor of GLBL and its majority ownership of and voting power over GLBL, its power to appoint the majority of the members of GLBL's board, establish and enforce its operating policies and procedures, and the rights and responsibilities granted by the Management Services Agreement, Investment Agreement and other agreements with GLBL or its subsidiaries and affiliates as detailed in ¶¶10, 49, 199 above.

212.    Chatila and Wuebbels were officers or directors of SUNE and GLBL at the time of the sale of GLBL Class D Securities to Plaintiffs.

213.   The GLBL Placement Agents materially aided in the preparation of the GLBL Class D Registration Statement and the sale of the Class D Securities to Plaintiffs and other investors.

214.   GLBL, SUNE, the GLBL Placement Agents, Chatila and Wuebbels knew about, or in the exercise of reasonable care could and should have known about, the misrepresentations and omissions in the GLBL Class D Registration Statement at the time it was filed with the SEC and at the time of the sale of GLBL Class D Securities to Plaintiffs.

215.   Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the misrepresentations and omissions in the GLBL Class D Registration Statement at the time they purchased the GLBL Class D Securities from GLBL.

216.   Plaintiffs suffered damages as a result of the misrepresentations and omissions in the GLBL Class D Registration Statement.  GLBL is civilly liable to Plaintiffs pursuant to Md. Code §11-703(a)(1)(ii).  SUNE, Chatila, Wuebbels and the GLBL Placement Agents are civilly liable to Plaintiffs pursuant to Md. Code §11-703(c)(1).  All defendants named in this cause of action are jointly and severally liable pursuant to Md. Code §11-703(c).

**Untrue Statements of Material Fact in and Other Material Facts Omitted from the GLBL Class D Registration Statement**

217.   The GLBL Class D Registration Statement repeatedly emphasized the advantages of GLBL's relationship with SUNE, emphasizing at pages 13-14:

> *Relationship with SunEdison.* We believe our relationship with our Sponsor provides us with significant benefits, including the following:
>
> - *Strong asset development track record.* Over the last three calendar years, our Sponsor has constructed solar power generation assets with an aggregate capacity of 2.0 GW and, as of December 31, 2014, was constructing additional solar power generation assets expected to have an aggregate capacity of approximately 467 MW. Our Sponsor has been one of the top three developers and installers of solar energy facilities in the world in each of the past two years based on megawatts installed. Our Sponsor has developed over 1,300 solar projects and has completed all of the projects on which it has commenced construction, including over 100 projects in our initial target markets. In addition, our Sponsor had a 5.1 GW pipeline of development stage solar projects as of December 31, 2014, including 1.3 GW in our initial and future target markets. As of the same date, our Sponsor employed 2,700 people globally, of which over 1,900 were serving as developers and operators of renewable energy projects. *Our Sponsor's operating history demonstrates its organic project development capabilities in our initial target markets. We believe our Sponsor's relationships, knowledge and employees will facilitate our ability to*

- 56 -

*rapidly acquire operating projects from our Sponsor in our initial target markets.*

- *Yieldco experience.* Our Sponsor's subsidiary, TerraForm Power, which owns and operates clean power assets located in the U.S. and other select jurisdictions, completed its initial public offering in July 2014. With our Sponsor's support, TerraForm Power has raised approximately $3.9 billion in acquisition and permanent financing to pursue acquisitions of renewable energy projects totaling 1,703 MW as of May 1, 2015.

- *Proven acquisition expertise.* In 2014, our Sponsor completed 32 corporate and project acquisitions worldwide, which included operating projects with an aggregate nameplate capacity of 1.5 GW. In addition, our Sponsor, through TerraForm Power, completed the acquisition on January 29, 2015 of First Wind's 500 MW of operating wind generation assets and 21 MW of operating solar generation assets and 1.66 GW of wind and solar generation assets under development. ***Our Sponsor has entered into seven separate acquisitions to acquire projects for our initial portfolio, expanding our geographic footprint and diversifying our renewable energy technologies. These acquisitions include LAP, which will provide our Sponsor with a hydro-electric development and operations and maintenance platform in Latin America, and Honiton, which will provide it with an operating and maintenance platform in China.*** We believe our Sponsor's significant acquisition experience and expertise will enable us to expand our portfolio through additional acquisitions of operating projects from unaffiliated third parties in our initial target markets.

- *Project financing experience.* We believe our ***Sponsor has demonstrated a successful track record of sourcing long-term capital to fund project acquisitions and the development and construction of projects located in our initial target markets. Over the twelve months ended January 31, 2015, our Sponsor has raised over $2.4 billion, including $2.1 billion to finance acquisitions. We expect that we will realize significant benefits from our Sponsor's financing and structuring expertise as well as its relationships with financial institutions and other providers of capital.***

- *Asset management expertise.* ***We will have access to the significant resources of our Sponsor to support the high-growth strategy of our business.*** As of December 31, 2014, our Sponsor had over 3.7 GW of projects under management across 20 countries. Approximately 19.0% of these projects are third-party power generation facilities, demonstrating our Sponsor's collaboration with multiple solar developers and owners. These projects utilize 29 different module types, and inverters from 16 different manufacturers. As of December 31, 2014, our Sponsor had approximately 700 employees servicing operations and management in our initial target markets. In addition, our Sponsor maintains three renewable energy operation centers to service assets under management. Our Sponsor's asset management experience helps ensure that our facilities will be monitored and maintained to maximize cash generation. We also benefit from First Wind's asset management expertise as the First Wind team has been integrated with our Sponsor. To date, First Wind has constructed or acquired wind power generation assets with an aggregate nameplate capacity of approximately 1.0 GW and, as of December 31, 2014, was constructing additional wind power generation assets expected to have an aggregate nameplate capacity of approximately 500 MW.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

218.   The GLBL Class D Registration Statement stated that at the time of the June 9, 2015 GLBL Class D offering GLBL's call rights projects to be provided to GLBL by SUNE would "represent an aggregate capacity of approximately 923.6 MW" and "forecast that our cash available for distribution during the twelve months ending June 30, 2016 and December 31, 2016 will be approximately $156.9 million and $164.8 million, respectively."

219.   The statements detailed in ¶¶217-218 above contained untrue statements of material fact or omitted to state other material facts necessary to make the statements made therein not misleading, including that:

(a)   SUNE lacked sufficient liquidity to support GLBL's stated acquisition strategy and CAFD growth forecasts while also meeting its other actual and anticipated financial commitments, including its financial obligations associated with the pending (but undisclosed) VSLR acquisition;

(b)   SUNE lacked sufficient cash to allow it to consummate the LAP acquisition;

(c)   SUNE had no reasonable basis to expect that it could develop sufficient additional liquidity sources given: (i) the amount of capital needed to carry out those activities, (ii) the existing state of the capital markets, (iii) the risks attendant with GLBL's emerging market operations, and (iv) the extent of SUNE's existing and other anticipated financing arrangements; and

(d)   as a result of (a)-(c) above, SUNE could not make the required $400 million payment on the LAP acquisition, and was faced with: (i) canceling plans to drop projects from the call rights list down to GLBL, including cancelling the Renova and Continuum acquisitions due to a lack of liquidity and the capital resources needed to complete them, and (ii) entering into acquisitions on unfavorable terms for the sole reason of providing SUNE with the cash needed to pay off the Margin Loan.

220.   The GLBL Class D Registration Statement also stated at page 139:

*Liquidity position*

We believe that following the completion of this offering we will have sufficient borrowings available under the Revolver, liquid assets and cash flows from operations to meet our financial commitments, debt service obligations, contingencies and anticipated required capital expenditures for at least the next twelve months.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

*Sources of liquidity*

Following the completion of this offering, we expect our ongoing sources of liquidity to include cash on hand, cash generated from operations, borrowings under new and existing financing arrangements and the issuance of additional equity securities, as appropriate, given market conditions. We expect that these sources of funds will be adequate to provide for our short-term and long-term liquidity needs.

221.   The statements in ¶220 above contained untrue statements of material fact and omitted other material facts necessary to make the statements made therein not misleading at the time they were filed with the SEC and the GLBL Class D Purchase Agreement was consummated on June 9, 2015. The defendants named herein lacked a reasonable basis for these statements at the time they were made in light of the fact that SUNE and GLBL did not have sufficient liquidity to fund the acquisition and development of the projects needed for GLBL's start-up portfolio while still meeting their other financial commitments, including SUNE's commitments to develop and acquire projects for GLBL.

## SIXTH CAUSE OF ACTION

### For Breach of Contract in Connection with the
### Purchase of GLBL Class D Securities Against GLBL

222.   Plaintiffs incorporate all prior allegations of the complaint herein by reference.

223.   This cause of action is brought for breach of the June 9, 2015 GLBL Class D Purchase Agreement entered into by Plaintiffs and GLBL, as previously alleged.

224.   The GLBL Class D Purchase Agreement provides that the contract is to be governed by and construed according to the law of the State of Delaware.

225.   The parties to the GLBL Class D Purchase Agreement intended to be bound by the terms of the agreement, which are sufficiently definite to be enforced.

226.   Plaintiffs purchased their GLBL Class D Securities from GLBL, paying valuable consideration measuring in the millions of dollars for the rights and benefits they received under the GLBL Class D Purchase Agreement. Plaintiffs' purchase was materially aided by Barclays. Barclays acted on behalf of and as agents for GLBL.

227.   Section 4 of the GLBL Class D Purchase Agreement contained representations and warranties made by GLBL "[a]s a material inducement to the Purchasers to enter into this Agreement and purchase the Class D Units hereunder."

- 59 -

228.    Section 4F of the GLBL Class D Purchase Agreement included the following representation and warranty by GLBL:

> As of the date of its filing with the SEC, the [May 7, 2015] Draft Registration Statement did not contain any misstatement of material fact or omit to state a material fact necessary to prevent the statements made therein from being misleading in any material respect, other than omitting information regarding valuation and financial projections.

229.    The GLBL Class D Registration Statement contained false statements of material fact and omitted to state facts necessary to prevent the statements made therein from being materially misleading, as described in ¶¶217-221.   GLBL therefore breached §4F of the Class D Purchase Agreement.

230.    Plaintiffs suffered damages as a result of GLBL's breach of §4F of the Class D Purchase Agreement.

231.    Section 4I of the GLBL Class D Purchase Agreement included a representation and warranty that "[s]ince December 31, 2014, (i) the Company and its Subsidiaries have, in all material respects, conducted their business in the ordinary course of business consistent with past practice and (ii) there has not been any Material Adverse Effect and no circumstances have arisen, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect." Section 6 of the GLBL Class D Purchase Agreement defines Material Adverse Effect as "a material and adverse effect or development upon the business, results of operations, assets, liabilities or financial condition of the Company and its Subsidiaries, taken as a whole."

232.    Section 4I was materially false and misleading.  The true facts were that SUNE had commenced negotiations to acquire VSLR prior to the filing of the GLBL Class D Registration Statement and was intent on acquiring VSLR *before* defendants named herein sold the GLBL Class D Securities to Plaintiffs on or about June 9, 2015, and had already entered an exclusive negotiating period to finalize the terms of the transaction.   VSLR's residential solar business represented a significant change from SUNE's, GLBL's and TERP's historical business, and would require more than $1 billion of additional financing to complete, as alleged above.  Thus, the planned VSLR acquisition represented a substantial and material departure in the conduct of the companies' business inconsistent with past practice.  Both individually and in the aggregate, the intended acquisition of VSLR was a

1   circumstance that was reasonably expected to have a Material Adverse Effect on GLBL, given the

2   additional financing required to consummate the VSLR acquisition and the lack of liquidity sufficient to

3   enable SUNE to meet its financial commitments to acquire, develop and construct projects to drop

4   down to GLBL following its IPO.

5          233.    GLBL breached §4I of the GLBL Class D Purchase Agreement.

6          234.    Plaintiffs suffered damages as a result of GLBL's breach of §4I of the Class D Purchase

7   Agreement.

8                          **SEVENTH CAUSE OF ACTION**

9          **For Negligent Misrepresentation in Connection with the
           Purchase of GLBL Class D Securities Against SUNE,**

10   **GLBL, Chatila, Wuebbels and the GLBL Placement Agents**

11         235.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

12         236.    This claim is brought against SUNE, GLBL, Chatila, Wuebbels and the GLBL

13   Placement Agents.

14         237.    The GLBL Class D Registration Statement contained untrue statements of material fact

15   or omitted to state other material facts necessary to make the statements made therein not misleading, as

16   alleged in ¶¶217-221 above.

17         238.    SUNE, GLBL, Chatila, Wuebbels and the GLBL Placement Agents had no reasonable

18   grounds for believing that the representations alleged in ¶¶217-218, 220 above did not contain untrue

19   statements of material fact or omitted to state other material facts necessary to make the statements

20   made therein not misleading.

21         239.    SUNE, GLBL, Chatila, Wuebbels and the GLBL Placement Agents intended that

22   Plaintiffs rely on the representations alleged in ¶¶217-218, 220 above in making a decision to purchase

23   the GLBL Class D Securities.

24         240.    Plaintiffs reasonably and justifiably relied on the representations alleged in ¶¶217-218,

25   220 above in entering into the GLBL Class D Purchase Agreement and in purchasing the GLBL Class

26   D Securities pursuant thereto.

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1      241.    Plaintiffs' reliance on the representations made by SUNE, GLBL, Chatila, Wuebbels and

2 the GLBL Placement Agents was a substantial factor in causing Plaintiffs' harm.

3      242.    Plaintiffs were harmed as a result of their purchases of GLBL Class D Securities.

4 **PRAYER FOR RELIEF**

5     WHEREFORE, Plaintiffs pray for relief and judgment as follows:

6     A.    Awarding Plaintiffs damages, together with pre- and post-judgment interest as provided

7 by contract or law;

8     B.    Awarding rescission or a rescissory measure of damages;

9     C.    Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

10     D.    Awarding such other relief, including equitable or injunctive relief, as is just and proper

11 under the circumstances.

12 **JURY DEMAND**

13     Plaintiffs demand a trial by jury on all claims so triable.

14 DATED: March 30, 2016

ROBBINS GELLER RUDMAN
  & DOWD LLP
15 DARREN J. ROBBINS
JAMES I. JACONETTE
16 JENNIFER N. CARINGAL

17

18                DARREN J. ROBBINS

19 655 West Broadway, Suite 1900
San Diego, CA 92101
20 Telephone: 619/231-1058
619/231-7423 (fax)

21

22 ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN
23 DAVID W. HALL
Post Montgomery Center
24 One Montgomery Street, Suite 1800
San Francisco, CA 94104
25 Telephone: 415/288-4545
415/288-4534 (fax)

26 Attorneys for Plaintiffs

27 I:\Admin\CptDraft\Securities\CPT SunEdison_Omega.docx

28

- 62 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW